In re Brenda A. COLE, Debtor.

Brenda A. COLE, Plaintiff,

v.

CENLAR FEDERAL SAVINGS BANK and Edward Sparkman, Trustee, Defendants.

Bankruptcy No. 90–10672S.
Adv. No. 90–0748S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 8, 1991.

Roger V. Ashodian, Delaware County Legal Assistance Ass'n., Chester, Pa., for debtor-plaintiff.

Gary McCafferty, Philadelphia, Pa., for defendant-Cenlar Federal Sav. Bank.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The success of the current Chapter 13 Plan of Debtor, who made but six of the 38 pre-petition mortgage payments due to her residential mortgagee, depends on her ability to convince us that she can utilize 11 U.S.C. § 506 to effectively "cram down" her sizable mortgage-payment arrears. Logic, as well as the express language of 11 U.S.C. § 1322(b)(5), dictates that she cannot do so. Therefore, although we will reduce the Mortgagee's "claim" for arrears by almost $2,000 to $12,801.05 in the instant adversary proceeding, we decline her invitation to cut this figure to $1,449.00.

In the alternative, the Debtor requests that we effectively rewrite her current mortgage by allocating a portion of her mortgage-payment delinquency to the unsecured portion of the Mortgagee's claim. We reject this effort as well. We will therefore compel the Debtor to prepare a Plan requiring payments of at least $300 monthly to avert dismissal of her underlying Chapter 13 case.

### B. PROCEDURAL AND FACTUAL HISTORY

BRENDA A. COLE ("the Debtor"), who is separated from her husband and is effectively a single parent of three children, filed the individual Chapter 13 bankruptcy case underlying the adversary proceeding at issue on February 14, 1990. The instant proceeding was not filed until September 25, 1990, the date that the confirmation hearing in this case was initially scheduled. The confirmation hearing was continued until the date that the proceeding was scheduled for trial, November 13, 1990. Both of these matters were continued again until December 4, 1990, at which time this proceeding was tried.

Also pending before us is a motion to dismiss this case filed by Defendant EDWARD SPARKMAN, the Chapter 13 Trustee ("the Trustee"). The Trustee's motion is based on the fact that the latest version of the Debtor's Plan calls for payments directly to him of only $1,982.50, while the secured claim filed by Defendant CENLAR FEDERAL SAVINGS BANK ("the Mortgagee") demands as follows:

REINSTATEMENT AMOUNT (Arrearages and Foreclosure Costs and Fees)

| | | |
|---|---:|---:|
| 32 monthly payments @ $374.15 each (from 7/87—2/90) | $11,972.80 | |
| 32 late charges @ $14.97 each (from 7/87—2/90) | 479.04 | |
| 11 property inspections @ $10.00 each | 110.00 | |
| Late charges due prior to this default | 250.00 | |
| Total Monthly Payments and Late Charges | | $12,812.64 |
| Filing and Service | $ 184.00 | |
| Title Report | 171.00 | |
| Sheriff's Sale | 647.30 | |
| Notaries | 40.00 | |
| Recorder of Deeds | 2.00 | |
| Legal Fee | 747.30 | |
| Fees and Cost | | $ 1,791.60 |
| | | $14,604.24 |

The current monthly payments are $374.15
The current principal balance is $32,551.69

---

This claim thus enumerates the Debtor's mortgage arrears as $14,604.42 and the total claim of the Mortgagee as the sum of this figure and the principal balance of $32,551.69, or $47,156.11.[1] Both of these figures are far larger than the $1,982.50 funded by the Plan. This discrepancy prompted the Mortgagee to file an Objection to Confirmation similar in content to the Trustee's motion to dismiss. *See In re Fricker*, 116 B.R. 431, 436 (Bankr.E.D.Pa. 1990) (while the local vernacular for this sort of Objection is the lack of "feasibility" of the plan, such a deficiency is in substance a claim of a plan's failure to meet the criterion of 11 U.S.C. § 1325(a)(5)(B), not that of 11 U.S.C. § 1325(a)(6)). In an Order of December 5, 1990, establishing an abbreviated briefing schedule, we continued the hearing on confirmation and the Trustee's motion to dismiss one last time to January 29, 1990.

The Complaint includes three Counts. The first recites an attempt to invoke 11 U.S.C. § 506 to reduce the Mortgagee's claim to $30,000, the alleged value of the Debtor's home, *see Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123, 128–29 (3d Cir.1990), less a $1,000 recoupment arising from alleged violations of the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"), which occurred in the writing of the mortgage loan, or $29,000.

In Count Two, the Debtor challenges certain of the specific components of charges enumerated in the proof of claim, *i.e.*, the amount of the "Legal Fee," the amount of the late charges, and the imposition of any charge for property inspections or "Notaries." Like Count One, this sort of claim is commonplace in this district.

The Third Count articulates the TILA recoupment claim. This, again, is a very typical sort of contention which comes before this court.

The only ambitious claim asserted in this proceeding is contained in the closing phrases of the prayer for relief, wherein the Debtor requests that this court "allow Cenlar's claim for 'reinstatement amount' as an unsecured claim only as a portion of Cenlar's allowed unsecured claim of $16,-

---

1. The face of the claim (not quoted here) makes note of a state court foreclosure judgment of $48,023.89. In its post-trial submission, the Mortgagee has recited a claim for an amount higher than the $47,156.11 sought in its proof of claim, based upon this judgment. *See In re Klein*, 106 B.R. 396, 401–02 (Bankr.E.D.Pa. 1989). However, since the specific facts relating to this judgment were not made part of the record in this proceeding nor even referenced until they were included in the Mortgagee's post-trial submissions, we will not consider the Mortgagee's calculations on this basis at this time.

307.83." In this rather opaque language apparently lies the contention that the arrears should be reduced by the unsecured portion of the Mortgagee's claim after the requested § 506 bifurcation.

At the trial, the parties stipulated that the value of the Debtor's home, located at 630 Columbia Avenue, Darby, Pennsylvania, was $35,000, rather than the $30,000 posited by the Debtor in her Complaint. They also ultimately stipulated that, of the 38 payments due on the parties' mortgage of November 16, 1986, between January, 1987, the date of the first payment, and February, 1990, the date of the bankruptcy filing, the Debtor had failed to make 32. The arrearages of 32 monthly payments and corresponding late charges for this 32–month period were therefore undisputed. While the issue of how the Debtor could allocate the secured and unsecured portions of the Mortgagee's claim was a legal issue argued at length, brief testimony from the Debtor, the only witness, was necessary only in reference to the issues of the proper late charges and the validity of the Debtor's TILA claims.

C.  THE DEBTOR IS ENTITLED TO REDUCTION OF THE LATE CHARGES AND LEGAL FEE CLAIMED, AND ELIMINATION OF CHARGES FOR "NOTARIES" AND HOME INSPECTIONS.

The Debtor testified that the January, February, and March, 1987, payments were timely made but that she was uncertain when payments were made thereafter. By way of some explanation, she stated that, at the time, she assumed that her estranged husband was making all of the payments. Later, when she discovered, to her surprise, that his failure to make payments had resulted in a large delinquency, she made several payments, admittedly late, but without including the late charge. Regarding her current payment history, the Debtor testified that, since the filing of her bankruptcy, she had been making her regular monthly mortgage payments directly to the Mortgagee by means of a wage attachment. Her original Chapter 13 Plan, we note, called for payments of $25 monthly to the Trustee for 60 months. On the date of the trial, the Debtor's counsel filed an Amended Plan calling for $15 monthly for 10 months and $36.65 for the remaining 50 months, which totals the $1,982.50 figure referenced at page 944 *supra.* She is apparently current in making the modest total payments of $150 called for by her plan to date.

■ It is apparent that the sum designated on the Mortgagee's proof of claim for "Late charges due prior to this default," *i.e.*, prior to the Debtor's admitted 32–month delinquency, was overstated. There were only six months in which payments fell due other than in the 32–month delinquency period for which late charges were already assessed. The parties agreed that the late charges were $14.97 per month. Accepting, in view of lack of contrary evidence, the Debtor's claim that the first three mortgage payments were timely made leaves only three more months in which payments could have been made, yet were late. Therefore, the total due for late charges outside of the 32–month period of delinquency could not possibly exceed $14.97 for three months, or $44.91. The $250 figure on the Mortgagee's proof of claim will be revised accordingly.

■ Several other specific entries on the proof of claim are also subject to reduction. The Mortgagee agreed that the charge for "Notaries" could not be sustained. *See In re Smith,* 92 B.R. 127, 133 (Bankr.E.D.Pa.1988), *rev'd in part on other grounds sub nom. Smith v. Kissell Co.,* 98 B.R. 708 (E.D.Pa.1989). Also, the Mortgagee was forced to concede that our holding in *In re Nickleberry,* 76 B.R. 413, 422 (Bankr.E.D.Pa.1987), required a reduction of the "Legal Fee" of $747.30 to $300.00. Finally, we observe that the mortgage in issue reads exactly like the mortgage in issue in *In re Burwell,* 107 B.R. 62, 65–68 (Bankr.E.D.Pa.1989). In *Burwell,* we held, for several reasons, including the failure of the mortgage document to so provide, that a claim for recovery of property inspection fees was unwarranted. Therefore, the $110 charge for this item must also be excised.

**D. THE DEBTOR IS ENTITLED TO SUCCEED ON HER TILA CLAIM, DESPITE HER FAILURE TO PRODUCE THE ALLEGEDLY ERRANT DISCLOSURE STATEMENT.**

The other area addressed by the Debtor in her testimony related to her claim for a TILA recoupment. Like the debtor in another matter involving the same counsel on both sides heard that same day, *In re Cobb, Cobb v. Mortgage Default Services,* 122 B.R. 22, 25–26 (Bankr.E.D.Pa.1990), the instant Debtor failed to produce a copy of the TILA disclosure statement which she was given in the transaction at trial.

However, unlike the *Cobb* debtor, the instant Debtor, while uncertain whether she had retained the disclosure statement, was quite positive that she and her husband had received such a document. Furthermore, she contended that she recalled reviewing the disclosure statement and noting that the statement had not recited that any security interest had been taken on her furniture or other household goods. As might have been expected, given the mortgage form utilized, *see, e.g., Searles v. Clarion Mortgage Co.,* 1987 WL 61932, 1987 U.S.Dist. LEXIS 11468, slip op. at 4 (E.D.Pa. Dec. 7, 1987); *In re Bender,* 86 B.R. 809, 814 (Bankr.E.D.Pa.1988); *In re Caster,* 77 B.R. 8, 9 (Bankr.E.D.Pa.1987); *In re Crompton,* 73 B.R. 800, 805–06 (Bankr.E.D.Pa.1987); *In re Johnson–Allen,* 67 B.R. 968, 971–72 (Bankr.E.D.Pa.1986); and *In re Cervantes,* 67 B.R. 816, 819 (Bankr.E.D.Pa.1986), and the selective convenience of the Debtor's recollections, the mortgage secured not only the real estate purchased in the transaction but also "all appliances, ... furniture ... (whether fixtures or not) of any nature now or hereafter installed in or upon said premises, . . . ."

The Mortgagee's counsel, skeptical to the point of suggesting that the Debtor had been "coached," asked her a series of questions on cross-examination aimed at testing her recollection of the nature of all of the papers which she received at settlement. The Debtor provided a fairly accurate overview of the papers received and rather convincingly reaffirmed her certainty that the disclosure statement had omitted reference to the security interest in her furnishings by stating that she "would have noticed if the stuff [she and her husband] had accumulated had been listed" as security.

Clearly, it is most awkward to attempt to prove a TILA claim of any sort without the disclosure statement in evidence. *Compare Cobb, supra,* at 25–26. While the Debtor's testimony here suggested less of a possibility that the statement could have been located than that of the Debtor in *Cobb, id.* at 25, we find, as in *Cobb,* the failure of the Debtor's counsel to exhaust this possibility is "indicative of a gross lack of preparation" on what should have been a simple issue to prepare. *Id.*

However, our small body of cases in the "missing disclosure statement" area suggests that the resolution of this issue is fact intensive. Thus, in *In re Herbert,* 86 B.R. 433, 438–39 (Bankr.E.D.Pa.1988), *aff'd sub nom. Herbert v. Federal Nat'l Mortgage Ass'n,* 102 B.R. 407 (E.D.Pa.1989); and *In re Pinder,* 83 B.R. 905, 912–14 (Bankr.E.D.Pa.1988), we found that the respective debtors' testimony that they had not received a disclosure statement was believable and sufficient to carry the day. By way of contrast, in *Caster, supra,* 77 B.R. at 14, we refused to believe similar testimony of a debtor who displayed a generally unreliable memory.

We can make a similar comparison between the *Cobb* debtor and the instant Debtor. The *Cobb* debtor had no recollection of having received a disclosure statement and therefore presented no evidence of a TILA violation. *See* at 25. However, the instant Debtor presented clear and ultimately unshaken testimony that a TILA violation existed in the papers which she reviewed. In *Pinder* we held that the debtor's "not totally convincing" testimony of lack of receipt of a disclosure statement was sufficient to shift the burden to the mortgagee to produce evidence that a disclosure statement had been received. 83 B.R. at 913. Certainly the instant Debtor, no more likely to have been coached by her counsel than the *Cobb* debtor who could

provide no helpful testimony, was, if anything, more convincing than the *Pinder* debtor. Finally, in light of the legion of cases in which a violation identical to that alleged here was found, see cases cited at page 947 *supra,* we cannot say, as we did in *Caster,* 77 B.R. at 14, that there is an "unlikely possibility" that the alleged violation occurred.

Therefore, we conclude that the instant Debtor has proven the validity of her right to a $1,000 TILA recoupment. The Mortgagee's valid "claim" for arrearages in this case is thus reduced to the sum of the 32 monthly payments in default ($11,792.08), the corresponding late charges for that 32–month period of $479.04, additional late charges of $44.91, undisputed costs of $1,004.30, and a legal fee of $300, less the $1,000 recoupment penalty, or $12,801.05. The corresponding valid claim of the Mortgagee for the total balance due is this figure of $12,801.05 plus the principal balance of $32,551.69, or $45,352.74.

The foregoing total balance claim of $45,352.74 can, per *Wilson, supra,* be bifurcated into a secured claim of not more than $35,000 and an unsecured claim for the balance. We have previously held that the entire TILA recoupment may be deducted from the secured portion of a mortgagee's bifurcated claim. *In re Jablonski,* 70 B.R. 381, 390 (Bankr.E.D.Pa.1987), *aff'd in part & remanded in part,* 88 B.R. 652 (E.D.Pa.1988). *But see Bender, supra,* 86 B.R. at 816–17 (TILA recoupment allocated between secured and unsecured portions of bifurcated claim). Continuing to believe that the reasoning of *Jablonski* is more consistent with the principle of *Griggs v. Provident Consumer Discount Co.,* 680 F.2d 927, 932–33 (3d Cir.1982), that a TILA penalty, modest as it is, should be applied to have the maximum meaningful impact on the wrongdoing creditor, we decline to follow *Bender* on this point. Therefore, the Mortgagee's claim for the total balance of $45,351.76 can be bifurcated into a secured claim of *$34,000* and an unsecured claim of *$11,352.74.*

**E. THE DEBTOR IS NOT ENTITLED TO REDUCE HER ARREARAGES OR ALTER THE TERMS OF PAYMENT OF HER MORTGAGE BY MEANS OF BIFURCATION OF A MORTGAGE CLAIM ON THE BASIS OF 11 U.S.C. § 506.**

The only issue remaining open for discussion and decision is the Debtor's novel contentions that her arrearages can be "crammed down," or, alternatively, that the payment terms of her mortgage can be altered because of the finding that the Mortgagee's claim for the entire balance can be bifurcated into secured and unsecured portions. Despite the vigor of the Debtor's arguments, undimmed by the skepticism and authorities to the contrary that we expressed and cited in *Cobb, supra,* at 27, particularly *In re Hyden,* 112 B.R. 431, *reaff'g,* 110 B.R. 46, 50–51 (Bankr.W.D.Okla.1990); and *In re Hayes,* 111 B.R. 924, 925–28 (Bankr.D.Ore.1990), we remain unconvinced.

At issue is interpretation of 11 U.S.C. § 1322(b), which reads, in pertinent part, as follows:

(b) Subject to subsections (a) and (c) of this section, the plan may—

. . . . .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

(3) provide for the curing or waiving of any default;

. . . . .

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; . . .

Although courts in some jurisdictions have held to the contrary, the decision in *Wilson, supra,* establishes that, in this jur-

isdiction, § 1322(b)(2) does not preclude what might be termed a "modification" of the terms of a mortgage debt by bifurcating it into secured and unsecured portions pursuant to 11 U.S.C. § 506(a), (d). 895 F.2d at 125–28. This conclusion is consistent with decisions of this court extending from former Chief Judge Goldhaber's decision in *In re Everett*, 48 B.R. 618 (Bankr.E. D.Pa.1985), through more recent decisions of all members of the present court in *In re Kessler*, 99 B.R. 635, 637–38 (Bankr.E.D. Pa.1989) (collecting recent cases); *In re Kehm*, 90 B.R. 117, 119–21 (Bankr.E.D.Pa. 1988) (TWARDOWSKI, CH.J.); *Bender, supra*, 86 B.R. at 814–15 (FOX, J.); and *Jablonski, supra*, 70 B.R. at 386.

However, § 506(a), (d) address valuation of secured *claims*. As we pointed out in *In re Vitelli*, 93 B.R. 889, 894–95 (Bankr.E. D.Pa.1988); and *In re Small*, 65 B.R. 686, 689–92 (Bankr.E.D.Pa.1986), *aff'd*, 76 B.R. 390 (E.D.Pa.1987), in analyzing § 506(b), a "claim" for mortgage arrears is not the same thing as "a 'secured claim,' which represents the entire balance owed on the mortgage and is the focal point of § 506." *Vitelli, supra*, 93 B.R. at 894. Thus, we stated, in *Vitelli*, that the term "claim," in § 506, refers only to the total balance due on the underlying mortgage. *Id.* Speaking of § 506(b) in a light which we believe is equally applicable to § 506(a), (d), we concluded that § 506 is "inapplicable to any pseudo-'secured claim' for mortgage arrears." *Id.* at 895. *Accord, Bender, supra*, 86 B.R. at 812; and *Small, supra*, 65 B.R. at 689–90. Therefore, the very language of § 506 itself precludes its application to "claims" for mortgage arrears.

The subsection of § 1322(b) which is implicated in the instant controversy, as we suggested in *Cobb, supra*, at 27 n. 3, is § 1322(b)(5), not § 1322(b)(2). It is therefore irrelevant that the instant mortgage document, which includes a security interest in the Debtor's appliances and household furnishings as well as her residential realty, places the instant loan transaction outside of the scope of § 1322(b)(2), which applies to a claim "secured only by a security interest in real property that is the debtor's principal residence." *See Wilson*, 895 F.2d at 128–29. The § 1322(b)(2) pro-

scription on modification of the Mortgagee's secured claim (again, distinct from a "claim" for mortgage arrears) is therefore inapplicable. However, notwithstanding whatever results from the analysis of § 1322(b)(2), § 1322(b)(5) requires a debtor who opts to utilize a Chapter 13 plan to cure arrearages on claims on which "the last payment is due after the date on which the final payment under the plan is due" to effect the cure of the default "within a reasonable time" and to abide with "maintenance of payments while the case is pending." *Cf. In re Simpkins*, 16 B.R. 956, 963 (Bankr.E.D.Tenn.1982) (§ 1322(b)(2) and (b)(5) overlap, but do not include the same exceptions, arguably due to poor draftsmanship).

In her Brief, aware of the court's tentative position due to the presence of the *Cobb* decision, the Debtor makes several half-hearted efforts to wish away the presence of § 1322(b)(5). Firstly, she asserts that the language of § 1322(b)(5) is precatory, not mandatory. However, the admittedly-precatory nature of § 1322(b)(5) is only due to the fact that a debtor can choose whether to attempt to liquidate the entire "modified" mortgage claim or cure arrearages. *See In re Scott*, 121 B.R. 605, 607, 21 BCD 82, 83 (Bankr.E.D.Okla.1990); and *Bender, supra*, 86 B.R. at 813. Once a debtor has chosen to cure arrearages in a Chapter 13 plan, § 1322(b)(5) requires that it be done in a certain way, *i.e.*, by curing all defaults in a reasonable time while maintaining current payments.

Secondly, the Debtor attempts to sidestep § 1322(b)(5) by suggesting that she is attempting to cure her defaults under § 1322(b)(3), which allows cures or waivers of defaults without any of the "strings" attached by § 1322(b)(5). However, we have previously held that § 1322(b)(3) is only applicable to the residuum of general situations not within the scope of the more particularized type of claims described in § 1322(b)(5), *viz.*, § 1322(b)(3) applies to claims based upon obligations on which the last payment is due *before* the final payment is due under the plan. *See In re Rowe*, 110 B.R. 712, 724 (Bankr.E.D.Pa. 1990); *Klein, supra*, 106 B.R. at 404; and

*In re Ford,* 84 B.R. 40, 43–44 (Bankr.E.D. Pa.1988). In the specific situation addressed by § 1322(b)(5), it must control. Otherwise, the obligations imposed by § 1322(b)(5) would be effectively excised from the Code.

Thirdly, the Debtor suggests, in a footnote in her submissions, that she is effectively dealing with the secured portion of her claim "outside" of her plan, while dealing with the unsecured portion "inside" the plan. This argument may represent merely semantical confusion over the meaning of the phrase "outside of the plan." *See In re Evans,* 66 B.R. 506, 509 (Bankr.E.D.Pa. 1986), *aff'd,* 77 B.R. 457 (E.D.Pa.1987). As we defined the term in *Evans,* paying "outside of a plan" is the exercise of an option "not to deal with a secured creditor at all by the terms of [a] Plan." *Id.* Specifically excluded from that definition was any attempt to utilize the plan to cure arrearages, pursuant to 11 U.S.C. § 1322(b)(2) or (b)(5). *See In re Waldman,* 81 B.R. 313, 314 (Bankr.E.D.Pa.1987); and *Evans, supra,* 66 B.R. at 509. Since the instant Debtor has opted to utilize her plan to cure mortgage arrearages under § 1322(b)(5), her treatment of the Mortgagee's claim cannot be considered as dealing with that claim "outside of the plan."

We believe that application of the requirement of § 1322(b)(5) that a debtor utilizing the benefit of that Code provision must *maintain* payments while effecting a cure prevents the Debtor from modifying the loan terms through elaborate revisionist amortization tables, as well as from deducting the unsecured portion of the debt from the arrearages in calculating the amount necessarily payable to cure a mortgage default.

The Debtor concedes, as she must, that all authority is to the contrary of her position. For instance, Collier states that "the curing of defaults pursuant to section 1322(b)(5) is a right conceptually distinct from chapter 13 cramdown," ¶ 1322.09, at 1322–22 (15th ed. 1990), strongly suggesting that mixing the issue of a § 506–driven "cramdown" with a cure of mortgage arrears under § 1322(b)(5) is inappropriate. *Cf. In re Barrett,* 113 B.R. 175, 177, 184–85 (Bankr.E.D.Pa.), *rev'd on other grounds,*

118 B.R. 255 (E.D.Pa.1990) (debtor who utilized 11 U.S.C. § 548 to avoid a pre-petition foreclosure sale cannot cure the arrears in his mortgage obligation in his Chapter 13 plan, but must pay off the entire mortgage balance); and *In re Rivera,* 108 B.R. 553 (Bankr.E.D.Pa.1989) (debtor allowed to pay a secured claim in full under a Chapter 13 plan even when applicable state law does not provide a right to cure). Accepting the Debtor's possibly overly-casual assumption that a five-year cure is "within a reasonable time," *but see* 5 COLLIER, *supra,* ¶ 1322.09[5], at 1322–23 to 1322–24; and *In re Ziegler,* 88 B.R. 67, 69–70 (Bankr.E.D. Pa.1988), we conclude that a debtor may satisfy the requirements of § 1322(b)(5) in effecting a cure of mortgage arrearages only by (1) maintaining regular mortgage payments according to the terms of the mortgage; and (2) curing all mortgage arrearages by the date of the final plan payment. This is the result reached by the other two cases on point cited in *Cobb, Hyden, supra;* and *Hayes, supra. Cf. In re Diquinzio,* 110 B.R. 628 (Bankr.D.R.I. 1990) (Chapter 13 debtor employing § 506 is not permitted to lower monthly mortgage payments); *In re Dilts,* 100 B.R. 759, 762 (Bankr.W.D.Pa.1989) (§ 506 does not permit a Chapter 11 debtor to impair a secured claim); and *Kehm, supra,* 90 B.R. at 125 (moratorium on regular monthly payments is not permitted to a Chapter 13 debtor attempting to utilize § 506 to "cram down" a mortgage claim).

The *Hayes* decision, addressing the issue in point here directly states, we think correctly, that

under § 1322(b)(5) and § 1325(a)(5) the debtor has two alternatives for treatment of a claim secured other than by a security interest in the principal residence. He or she may either leave the contract intact (maintain and cure) or alter the terms and pay the present value of the secured claim (cram-down).

Given the above, altering the monthly payment or other term must be considered a modification which is impermissible when dealing with a creditor secured solely by the principal residence.

We agree with the Debtor that the reasoning of *Hayes* is not totally applicable in this jurisdiction. The reference of the *Hayes* court to § 1322(b)(2), immediately after the passage quoted above, is misplaced when, as here, the Mortgage includes security interests in property other than the debtor's residential realty. *See Wilson, supra,* 895 F.2d at 128–29. The reference to allowance of interest on arrears, *id.* at 127–28, is not consistent with *In re Capps,* 836 F.2d 773, 775–77 (3d Cir.1987). However, these differences do not alter the accuracy of the *Hayes* court's analysis of § 1322(b)(5). This court cannot ignore § 1322(b)(5) despite any willingness it might have to allow the Debtor to take advantage of the full measure of the fresh start which the Code allows. We cannot allow her to have a "start" even "fresher" than is allowed by the Code.

The second opinion of the *Hyden* court, 112 B.R. at 433–34, addresses the policy or logic of the Debtor's position. It posits that a debtor who has made all or most of the pre-petition payments due under a long-term obligation should not be placed in a worse position than a debtor who has missed all or most of the pre-petition payments simply *because* the payments were made. If we followed the Debtor's suggestion that her mortgage can be reamortized to account for its secured and unsecured portions, we *would* be rewarding her simply because she has a poor payment record. The mortgage balance and hence the unsecured portion of the Mortgagee's claim is increased solely because of the Debtor's failure to make payments. The Debtor invites us to reduce her monthly payments as a function of this large unsecured balance. Therefore, the Debtor asks us to build an incentive for her to refuse to make mortgage payments into her mortgage transaction. While we have expressed dismay at the lack of sensitivity of mortgagees who have suggested that we should consider the "fault" of debtors in "causing" the value of their homes to deteriorate, *see In re Blakey,* 76 B.R. 465, 471, *modified,* 78 B.R. 435 (Bankr.E.D.Pa.1987), we consider it equally inappropriate to encourage debtors to default on mortgage payments. We agree with the analysis in *Hyden,* 112 B.R.

at 433–34, that hypothetical debtors in equally-valued homes should be compelled to make the same total payments by the end of the period of their plan payments.

We therefore concur with the reasoning of the unanimous weight of authority: that it would constitute an inequitable windfall to the Debtor, as a matter of logic or policy, to allow her to avoid the proscriptions of § 1322(b)(5), and that the Code precludes avoidance of the terms of § 1322(b)(5) in the instant contest. Thus, we hold that, if the Debtor is to propose a "feasible" Chapter 13 plan which will overcome the Trustee's motion to dismiss, she must not only continue to maintain her regular monthly mortgage payments, as she alleges that she has done, but she must also liquidate all of the arrearages owed to the Mortgagee in the 60–month period beginning on the date that payments first become due.

The additional performance required from the instant Debtor to accomplish this end, relative to her present plan, is somewhat less imposing than that which we placed upon the *Cobb* debtor in permitting her to amend her plan to render it confirmable. *Compare Cobb, supra,* at 27–28. The instant Debtor promptly filed her plan on the date of the filing of her petition and therefore began making payments in March, 1990. She has allegedly kept up with her regular post-petition monthly mortgage payments through wage deductions.

Still, it is required that she liquidate an arrearage of $12,801.05 within 60 months, *i.e.,* on or before February, 1995. Although no deferral interest need be added to a "claim" for arrearages, a trustee's commission of ten (10%) percent must be added, requiring the Debtor to shoulder payments to the Trustee amounting to slightly over $14,000 to render her plan compatible with 11 U.S.C. § 1325(a)(5)(B). Since she has only remitted $150 to date, almost $14,000 remains payable over the next 50 months. We will therefore insist that she remit payment of at least $300 monthly, commencing in January, 1991, if

she is to resist the Trustee's motion and prepare a confirmable plan.

## F. CONCLUSION

Because of the age of this case, we will allow the Debtor only until January 18, 1991, to file and serve a confirmable plan, in preparation for the final hearing of January 29, 1991, to consider Confirmation and the Trustee's motion to dismiss, per our Order of December 5, 1990.

### ORDER

AND NOW, this 8th day of January, 1991, after trial of the above-captioned adversary proceeding in which the Debtor is the Plaintiff on December 4, 1990, and upon consideration of the post-trial submissions of the parties, it is hereby ORDERED and DECREED as follows:

1. Judgment is entered in part only in favor of the Debtor, BRENDA A. COLE ("the Debtor"), and against Defendant, CENLAR FEDERAL SAVINGS BANK ("the Mortgagee").

2. Pursuant to 11 U.S.C. § 506(a), (d), the extent of the value of the Mortgagee's interest in the Debtor's interest in the Premises is determined to be $35,000.00.

3. The Mortgagee's Proof of Claim is further reduced by a Truth-in-Lending Act ("TILA") penalty recoupment of $1,000. 15 U.S.C. § 1640(a)(2)(A)(i).

4. The Mortgagee is allowed a total claim of $45,352.74, which is bifurcated into a secured claim of $34,000 and an unsecured claim of $11,352.74.

5. Any Amended Plan proposed by the Debtor in light of this Opinion and Order shall be filed and served upon the Mortgagee's counsel, the Trustee, and the court in chambers on or before January 18, 1991.

6. Any Objection to any Amended Plan filed shall be filed and served upon the Debtor's counsel, the Trustee, and the court in chambers on or before January 25, 1991.

7. The final hearing on Confirmation of the Plan and the Trustee's Motion to Dismiss this case shall remain scheduled on

TUESDAY, JANUARY 29, 1991, at 9:30 A.M. and shall be held in Courtroom No. 2

(Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

8. In light of the long pendency of this case, no continuances of the dates set forth in this Order will be entertained. If the Debtor cannot or does not meet the requirements placed upon her, this case will be dismissed.