**In re Denise J. GELLETICH, Debtor,**

**Denise J. GELLETICH, Ronald L. Gelletich, Plaintiffs,**

**v.**

**HOUSEHOLD REALTY CORP., Defendant.**

**Bankruptcy No. 93–16757DAS.**
**Adv. No. 94–0176DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 18, 1994.

Alfred Hemmons, Bethlehem, PA, for debtor.

Terrence J. McCabe, McCabe, Weisberg, Conway & Watson, Andrew N. Schwartz, Philadelphia, PA, for Household Realty Corp.

Gary McCafferty, Philadelphia, PA, for Anchor Mortg. Services, Inc.

---

Edward Sparkman, Philadelphia, PA, Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court are several matters arising in the Chapter 13 bankruptcy case of DENISE J. GELLETICH ("the Debtor"), including an adversary proceeding ("the Proceeding") filed by the Debtor and her husband, RONALD L. GELLETICH ("the Husband," and with the Debtor, "the Plaintiffs")[1] against HOUSEHOLD REALTY CORP. ("Household"). In the Proceeding, the Plaintiffs seek to "avoid" the liens of Household, whose loan is secured by a second mortgage on the Plaintiffs' residential real property at 3209 Mink Road, Kintnersville, Bucks County, PA ("the Home").

Although the complaint filed in the Proceeding ("the Complaint") alleges only that Household's lien is a judicial lien which impairs the Debtor's exemptions and may be avoided pursuant to 11 U.S.C. § 522, an undeveloped reference in the Complaint to 11 U.S.C. § 506, as well as the Plaintiffs' arguments at the hearing on the Proceeding, make it clear that the Plaintiffs also believe that Household's lien either should be avoided completely as a result of a discharge order entered in the Plaintiffs' prior Chapter 7 bankruptcy, or at least avoided in large part because of the small amount of equity in the Home which exceeds the lien of the first mortgagee, Anchor Mortgage Services, Inc. ("Anchor"). Also before us are the motions of Household and Anchor for relief from the automatic stay ("the Household Motion" and "the Anchor Motion" respectively; collectively, "the Relief Motions").

Resolution of the Proceeding prompts this court to review the history of debtors' use of § 506 to bifurcate loans of mortgagees into secured and unsecured portions, pejoratively referred to as "lien-stripping," in this jurisdiction, and to update the status of this issue

in the eyes of this court. Unfortunately, due to the Plaintiffs' bad timing in assertion of their bifurcation-like claims, we can provide no relief to the Plaintiffs in the Proceeding. We will provide the Debtor with a limited time to respond to this ruling. If she is unable or unwilling to respond as we deem appropriate, the case will be dismissed and the Relief Motions will effectively be granted.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed this case under Chapter 13 of the Bankruptcy Code on November 19, 1993. This case was preceded by two other pertinent filings: (1) Bankr. No. 90–23179T ("the 1990 Case"), in which both Plaintiffs were debtors, filed under Chapter 13 on December 3, 1990, and converted to a Chapter 7 case on March 18, 1991; and (2) Bankr. No. 93–21487T, an individual Chapter 13 case filed by the Debtor only on May 27, 1993, and dismissed on September 23, 1993, just prior to disposition of a predecessor to the instant Household Motion. After the Plaintiffs were duly discharged in the 1990 Case on July 22, 1991, and upon Household's institution of a state court foreclosure action against the Plaintiffs, the Plaintiffs moved, on November 6, 1992, to reopen the 1990 Case to challenge the dischargeability of Household's lien. This Motion to reopen was denied by Judge Twardowski of this court on December 8, 1992, and an appeal was ultimately abandoned.

The Household Motion presently before us was filed on December 17, 1993. In that Motion, Household sought, in addition to relief to proceed with its foreclosure of the Home, an Order that no future bankruptcy case would stay any foreclosure action instituted by it against the Home, in light of the history of (now) three bankruptcy cases which had forestalled its efforts at foreclosure. After an agreed continuance, we conducted a March 1, 1994, hearing on the Household Motion. The following day, we entered an Order of March 2, 1994 ("the

---

**1.** Since the Husband is a non-debtor, it is doubtful whether this court could provide any relief to him, especially in the nature of objections to a claim in the case of his wife-Debtor only. *See In* *re Sciortino,* 120 B.R. 369, 373–74 (Bankr. E.D.Pa.1990). Our disposition of these matters, denying all relief to the Plaintiffs, renders further consideration of this issue unnecessary.

March Order"), consistent with our articulated resolution at the close of the hearing. In that Order, we decreed that the automatic stay would remain in place contingent upon the Debtor's

    a. Mak[ing] payments of at least $750 monthly to the Trustee on or before March 25, 1994, and the 25th day of each successive month, pending confirmation of a Plan.

    b. Fil[ing] and serv[ing] an adversary proceeding to establish the amount of Household's secured claim on or before March 11, 1994.

The trial date for the projected proceeding was set for April 14, 1994, the first scheduled date for a hearing to consider confirmation of the Debtor's plan. The plan provides that the Debtor will pay $498 to the Trustee for five years, and, in addition, will pay $450 monthly, presumably the Plaintiffs' regular mortgage payment, directly to Anchor.

The Proceeding was filed by the Plaintiffs on March 9, 1994, in response to the March Order. The Anchor Motion was filed on March 10, 1994, alleging that, despite the plan provisions calling for same, regular monthly mortgage payments were not being made to it. The initial hearing on the Anchor Motion, scheduled on April 7, 1994, was continued by agreement until April 21, 1994.

Finally, on March 21, 1994, the Debtor filed an objection to Household's secured proof of claim in the amount of $129,824.84 ("the Objection"). Because the Objection was filed with the number of the Proceeding on it, rather than with only the main bankruptcy case number affixed, a hearing on the Objection was not scheduled. The Objection reiterates the positions advanced by the Plaintiffs in the Complaint and questions the calculation of Household's claim as reflected in its proof of claim.

The parties all agreed to continue the trial of the Proceeding and hearings on the Household Motion and confirmation to the April 21, 1994, date of the hearing on the Anchor Motion. At the outset of that hearing, the Debtor's counsel agreed that, because the Objection was based upon the same grounds as the Complaint, it was appropriate for him to withdraw it. Although the relief sought by the Objection is actually broader than the Complaint in that it also seeks to recalculate Household's claim in the alternative to the relief sought in the Complaint, in light of our ruling adversely to the Plaintiffs in the Proceeding, we will dismiss the Objection.

The Husband was the sole witness for the Plaintiffs. He testified that he believed that the present value of the Home was $194,000, as opposed to the $180,000 to $185,000 range he had recited for the value of the Home at the March 1, 1994, hearing. An appraiser called by Household presently valued the Home at $200,000. Since the Debtor testified that Household had appraised the Home at $255,000 when it made the loan to the Plaintiffs in February 1988, it seems fair to assume that its value has dropped rather sharply over the past few years.

The Debtor's counsel stipulated that the Anchor claim could be valued at $190,000 for purposes of this hearing. Thus, the secured portion of Household's claim, declared in a total amount in excess of $129,000, was effectively agreed to be between $4,000 and $10,000.

The Husband recited his belief that the 1990 Case should have automatically eliminated, and therefore in his mind did eliminate, all or most of Household's mortgage lien, since Household's mortgage was drastically undersecured. As to the Plaintiffs' performance in this case, the Husband stated that they had made the March payment of $750 to the Trustee, per the March Order, and planned to make the April payment. He admitted that no post-petition payments had been made to Anchor. However, he expressed the Plaintiffs' willingness and ability to do so after Household's status was clarified, stating that it was difficult for the Plaintiffs to pay both legal fees to their counsel and the mortgage payments at once.

At the close of the April 21, 1994, hearing, we continued the confirmation hearing until May 19, 1994, and directed the parties to file Opening and Reply Briefs on the issues tried before us on May 2, 1994, and May 9, 1994, respectively. Household filed two timely Briefs. The Debtor filed two Briefs, each

one day late. Anchor filed only an Opening Brief.

## C. DISCUSSION

### 1. DEWSNUP, EVEN AS INTERPRETED BY SAPOS AND TARAS, PRECLUDES BIFURCATION OF AN UNDERSECURED MORTGAGE CLAIM IN A CHAPTER 7 CASE.

■ Although not clearly articulated in the Complaint, the Plaintiffs' main argument in the Proceeding is that (1) the discharge order from their prior Chapter 7 bankruptcy avoided the unsecured portion of the undersecured lien of Household; and (2) this effect of the discharge order is res judicata in their favor as to the continued presence of the unsecured portion of Household's lien, requiring their success in the Proceeding. The Plaintiffs cite our opinion in In re Taras, 136 B.R. 941 (Bankr.E.D.Pa.1992), as their principal support for this argument.

In Taras, the debtors had successfully filed an adversary action in their initial Chapter 13 bankruptcy case seeking to bifurcate the claim of their mortgagee. Id. at 944. That previous case had ultimately been converted to a Chapter 7 case and the Debtors were discharged in that case. Id. Thereafter, they filed a new Chapter 13 bankruptcy case and a new adversary proceeding, virtually identical to their previous proceeding, in the new case. The issues presented were (1) whether the intervention of the decisions in Dewsnup v. Timm, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); and First Nat'l Fidelity Corp. v. Perry, 945 F.2d 61 (3rd Cir.1991), effectively overruled the decision in Wilson v. Commonwealth Mortgage Corp., 895 F.2d 123 (3rd Cir.1990), which we had followed in rendering our decision in the debtors' prior adversary proceeding. This issue raised important questions regarding application of the principle of stare decisis; and (2) whether the outcome of the prior proceeding was res judicata, requiring an adjudication in the debtors' favor in the new proceeding. Ultimately, we did accord res judicata effect to the judgment arising from the initial adversary proceeding. Id. 136 B.R. at 945–48. However, we did not address the issue of res judicata effect of the discharge order subsequently entered after the first Chapter 13 bankruptcy was converted to a Chapter 7. It is the Plaintiffs' failure to recognize this distinction which dooms their position.

In Taras, we observed that the January 15, 1992, decision in Dewsnup overruled the holding in Gaglia v. First Federal Savings & Loan Ass'n, 889 F.2d 1304 (3rd Cir.1989), that bifurcation of liens was permissible in a Chapter 7 bankruptcy case. 136 B.R. at 947. We also recognized that, if Dewsnup had overruled Wilson, supra, which held that bifurcation was permissible in a Chapter 13 bankruptcy case, the "intervening change" exception to the application of res judicata would have possibly precluded our ruling in favor of the debtors in the proceeding before us solely on the basis of res judicata. Id. However, we ultimately concluded that Dewsnup had not expressly overruled Wilson, and therefore we were bound to follow Wilson unless and until the Court of Appeals said otherwise. Id. at 948–50.

We also considered whether the holding in Perry, supra, that § 1322(b)(2) prevented New Jersey debtors from eliminating mortgage obligations by liquidating the secured portion of such obligations in a Chapter 13 plan after a foreclosure judgment had been entered against them, also precluded the instant Pennsylvania debtors from succeeding in their efforts to eliminate their mortgage obligation by paying the secured portion of their mortgagee's claim in their Chapter 13 plan, despite the presence of a prior foreclosure judgment. Id. at 950–52. In addition to finding a Pennsylvania policy of allowing ailing mortgagors to save their homes by means other than curing arrears, which clearly was permissible post-judgment under Pennsylvania law, thus distinguishing Perry's application of New Jersey law, id. at 951–52, we pointed to the fact that the debtors' mortgage included a security interest in, inter alia, various items of household furniture owned by the debtors, and any rents earned from the premises. Id. at 951. Wilson had previously held that a similar "sundry furniture clause" eliminated the restrictive application of 11 U.S.C. § 1322(b)(2) in its entirety. 895 F.2d at 128–30. Although the Perry

decision appears to acknowledge the presence, in the operative documents, of a clause in which the mortgagee took a security interest in personalty, which might have taken the mortgage at issue in that case out of the scope of § 1322(b)(2), the *Perry* court refused to consider that issue because it was not raised below. 945 F.2d at 62 n. 1.

This court therefore followed *Wilson* despite the intervention of *Dewsnup* and *Perry*. It determined that the decision in the debtors' prior proceeding in their prior case was indeed *res judicata* of their right to eliminate the mortgage by paying off its secured portion in full in a Chapter 13 plan. 136 B.R. at 950, 952.

Two other observations are appropriate. First, we observed, in *Taras*, that the decision in the first proceeding in the debtors' first case was probably sufficient in itself to discharge all but the secured portion of the mortgagee's claim. *Id.* at 946–47. This was because we did not believe that *Dewsnup*'s overruling of *Gaglia* should be applied retroactively. *Id.* at 947 n. 2.

Second, our prediction that *Dewsnup* and/or *Perry* would not be held to overrule *Wilson* was validated in large part in *Sapos v. Provident Institution of Savings*, 967 F.2d 918 (3rd Cir.1992). No argument regarding the application of *Perry* is addressed in that decision, but the *Sapos* court clearly approves the notion of a plan which contemplates payment of the secured portion of a mortgagee's claim in full. *Id.* at 927–28.

Meanwhile, the *Sapos* court clearly held that *Dewsnup* did not overrule *Wilson* in either of two respects. First, the reasoning of *Dewsnup* is found inapplicable to a Chapter 13 case. *Id.* at 924–25. Second, the inapplicability of § 1322(b)(2) to a mortgage which contains a security interest in property other than the debtor's principal residence is expanded to include a mortgage containing a security interest in only "wall-to-wall carpeting, rents and profits," as opposed to one including only as broad a security interest in personalty as was effected by the "sundry furniture clause" that was at issue in *Wilson*.

All of this history vindicating *Taras* supports its result. However, unfortunately for the Plaintiffs, the facts of *Taras* are quite distinct from those in issue here. The crucial distinction is that, while the *Taras* debtors successfully litigated a bifurcation proceeding in their initial bankruptcy case, the Debtors filed no comparable proceeding in the 1990 Case. Thus, *Taras* is of little help to the Plaintiffs.

2. *NOBELMAN,* EVEN AS INTERPRETED BY THIS COURT IN ITS DECISION IN *HIRSCH,* PRECLUDES THE PLAINTIFFS FROM AVOIDING AN UNDERSECURED PORTION OF A LIEN WHICH IS SUBJECT TO § 1322(b)(2) IN A CHAPTER 13 CASE.

Subsequent to *Sapos,* the Court decided *Nobelman v. American Savings Bank,* ⎯ U.S. ⎯, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). As this court pointed out in *In re Hirsch,* 155 B.R. 688, 689 (Bankr.E.D.Pa. 1993) ("*Hirsch I*"), *rev'd,* 166 B.R. 248, (E.D.Pa.1994) ("*Hirsch II*"), *Nobelman* overruled that portion of *Sapos,* 967 F.2d at 924–25; and *Wilson,* 895 F.2d at 126–28, which held that bifurcation of claims in a Chapter 13 case in no way contravened § 1322(b)(2). However, the *Nobelman* Court, in holding that § 1322(b)(2) *did* preclude bifurcation, did not address the scope of § 1322(b)(2), nor did it indicate what sort of security interests in addition to those taken in the realty itself might take a mortgage out of the protection of § 1322(b)(2) entirely. Thus, the second prong of the decisions in *Wilson* and *Sapos,* holding that security interests in sundry furniture and "wall-to-wall carpeting, rents, and profits," respectively, eliminated any application of § 1322(b)(2), was untouched by *Nobelman.*

In rendering our decision in favor of the *Hirsch* debtor in *Hirsch I,* we applied, to *Nobelman,* the same principles of *stare decisis* which we had applied with respect to *Dewsnup* in *Taras, supra,* 136 B.R. at 948–50. We held that we were bound by that portion of *Wilson* and now also *Sapos* which was not addressed in, nor overruled by, *Nobelman.*

We reiterate that we consider our reasoning in *Taras* and *Hirsch I* regarding the

application of *stare decisis* to be correct. We state this not only because it happened that our conclusion that *Dewsnup* did not over-rule *Wilson* was vindicated by *Sapos*, but also because the result which we reached was required by application of the fundamental precepts of *stare decisis*. As a lower federal court, we deem it inappropriate to pronounce that the Supreme Court has *sub silentio* reversed a clear precedent of our Court of Appeals, whose mandate must be our command, until it is perfectly obvious that it has done so or the Court of Appeals itself so concludes.

We emphasize this point because we be-lieve that it reflects our differences with the reasoning employed in *Hirsch II*. In render-ing that decision, the district court, per Judge Dalzell, directed the parties to place into the record the mortgage at issue in *Nobelman*, which was not made a part of the record in this court and of course raises an issue that was not argued to or considered by us. 166 B.R. at 250–51. [2]

Then, the *Hirsch II* court compared the *Nobelman* mortgage, which provided for a security interest in "an undivided .67% inter-est in the common areas of the condominium complex, escrow funds, proceeds of hazard insurance, and rents," in addition to the debt-ors' residence itself, with the *Hirsch* mort-gage, which the parties had stipulated in this court took a security interest in

> all the improvements now or hereafter erected on the property and all easements, rights, appurtenances, rents[,] royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property.... All replacements and additions are also covered by the Security Instrument.

155 B.R. at 689. Since it found the language in the *Nobelman* and *Hirsch* mortgages "in all material respects identical," the *Hirsch II* court held that *Hirsch I* must be reversed on this point. 166 B.R. at 253–54.

The *Hirsch II* court also decided, in that same opinion, an appeal from another deci-sion of this court in another case, *In re Kane, Kane v. Citicorp Mortgage Corp.,* Bankr. No. 93–11897DAS, Adv. No. 93–0427DAS (Bankr. E.D.Pa. July 1, 1993). Since the security interest taken in personalty in *Kane* was verbatim the broad "sundry furniture clause" considered in *Wilson*, we had merely issued an Order deciding that matter favorably to the Debtor on this point. However, stating that the *Wilson* court found "independent value" in the personalty and that the value of the personalty was not addressed by the parties in *Kane*, the two cases are thusly distinguished by the *Hirsch II* court.

Perhaps recognizing that, in fact, the *Wil-son* court stated that the absence of "inde-pendent value" of the personalty was *imma-terial* to its result, 895 F.2d at 128–29, the *Hirsch II* court, in what we believe is accu-rately characterized as its definitive holding, effectively concludes that *Wilson* should not be followed because its holding on this point "is hard to reconcile with the mortgage not stripped in *Nobelman,* which covered miner-al, oil and gas rights and profits in the con-text of a residential secured lending docu-ment." 166 B.R. at 254–55.

We believe that it is impossible to reconcile the *Hirsch II* result in the *Kane* debtor's fact setting with *Wilson*. We also believe that it is almost as difficult to reconcile the *Hirsch II* result in the *Hirsch* fact setting with *Sapos*. [3]

---

**2.** We also must express our doubt as to whether this *sua sponte* expansion of the record was ap-propriate. *See Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976); *Salvation Army v. New Jersey Dep't of Community Affairs,* 919 F.2d 183, 196 (3rd Cir. 1990); and *Hutchins v. Commonwealth Mortgage Corp.,* 165 B.R. 401, 403 (E.D.Pa.1994) (general-ly, an appellate court should refuse to consider an issue not raised below). *See also Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 609–10 (11th Cir.1991); and *Leonard v. Dixie Well Service & Supply, Inc.,* 828 F.2d 291, 295–96 (5th Cir.1987) (an appellate court may not consider evidence

which was not admitted into the trial court's record).

**3.** Chief Judge Bentz of the Western District of Pennsylvania attempts to distinguish *Sapos* from a case before him which involves a security inter-est very much like that in issue in the *Hirsch* case in *In re Lutz,* 164 B.R. 239, 242 (Bankr.W.D.Pa. 1994). We are not convinced, as apparently was Judge Bentz, that *Sapos* was remiss in "consider-ing" that "wall-to-wall carpeting, rents, and prof-its" are personalty rather than realty. Moreover, we again submit that the *Sapos* court's resolution

Nor are we and Judge Cosetti, *see Heckman, supra,* alone in our conclusion that *Nobelman* does not necessarily overrule *Wilson* and *Sapos.* Four other district judges of this district have reached a conclusion opposite from the *Hirsch II* on facts identical to those of the *Kane* debtor. *See In re Johns,* 165 B.R. 405 (E.D.Pa.1994) (PADOVA, J.); *Hutchins, supra,* (J. KELLY, J.); *In re Laws,* 163 B.R. 449 (E.D.Pa.1994) (BUCKWALTER, J.); and *In re Hammond,* 156 B.R. 943 (E.D.Pa.1993) (REED, J.). Since the district court as well as this court is bound to follow *Wilson* and *Sapos* unless and until they are overruled, it is submitted that this court is precluded, by *stare decisis,* from following *Hirsch II,* and is obliged to follow *Hutchins, Johns, Laws,* and *Hammond* instead. *See also Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1371–72 (3rd Cir.1991); and *In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 106 n. 1 (Bankr.E.D.Pa.1991) (a decision of a district judge of a multi-judge district court is not the "law of the district," and need not be followed by a bankruptcy judge in that district in later cases, especially when decisions of other district judges in that district are to the contrary).

To complete discussion of the issue of bifurcation of a mortgagee's secured claim in a Chapter 13 case,[4] we also will note briefly an argument raised by certain mortgagees, based on the holding in *In re Stendardo,* 991 F.2d 1089 (3rd Cir.1993). They argue that the security interests taken by them in their mortgagors' respective personalty merges with their foreclosure judgments, and are thereby eliminated, thus causing § 1322(b)(2) to become appliable as to a mortgage otherwise beyond the scope of § 1322(b)(2). This argument is accepted in *In re Narvaez,* 161

B.R. 762 (Bankr.D.N.J.1993), and is deemed "persuasive," although the issue is not reached, by the *Hirsch II* court. 166 B.R. at 253 n. 9. However, it is rejected in *Johns, supra,* 165 B.R. at 406; and *Laws, supra,* 163 B.R. at 452–53.[5]

We believe that this argument must fail, for several reasons. First, *Perry* itself, 945 F.2d at 64–65, has held that the scope of a mortgagee's security interest is not changed by the entry of a foreclosure judgment in the mortgagee's favor. Second, assuming *arguendo* that a foreclosure judgment does alter a mortgagee's security interest, the resulting judgment would give rise to a lien which would not be restricted to a security interest on the debtor's residential realty, but would attach to any realty the debtor might own. *Cf. In re Klein,* 106 B.R. 396, 401–02 (Bankr.E.D.Pa.1989) (merger may convert a mortgagee's lien into an open-ended obligation).

Finally, if we adopted the reasoning of the *Hirsch II* court that an appellate court decides *sub silentio* all issues presented in a case before it, even if those issues are not addressed by the appellate court, we note that a pre-petition foreclosure judgment had been entered against the *Sapos* debtor, 967 F.2d at 922, but that this fact did not cause the Court of Appeals to shrink from allowing the debtor to bifurcate his mortgage. Thus, the *Sapos* court held, per the reasoning of the *Hirsch II* court in support of *sub silentio* stare decisis, that the entry of a foreclosure judgment is irrelevant to a debtor's right to bifurcate, and the *Hirsch II* court is bound by that decision. We are, however, somewhat unwilling to advance the theory of *sub silentio stare decisis* because we believe that it is based on erroneous assumptions regard-

---

4. It is not impermissible to modify a residential mortgage in a Chapter 11 case. *See In re DeSeno,* 17 F.3d 642, 646 (3rd Cir.1994). The use of Chapter 11 in consumer cases in New Jersey and possibly elsewhere if *Nobelman* were read expansively was portended in *Taras, supra,* 136 B.R. at 950 n. 4.

5. In *Hutchins, supra,* this issue was deemed waived because it was not raised in the bankruptcy court. 165 B.R. at 403. *See* page 375 n. 2 *supra.*

of this issue is not ours, nor any bankruptcy court's, nor any district court's to question, because *Sapos* is controlling on all district and bankruptcy courts in this Circuit until overruled. *See In re Heckman,* 165 B.R. 16 (Bankr.E.D.Pa. 1994) (former Chief Judge Cosetti of the Western District of Pennsylvania, sitting in this district, holds that, where the mortgagee takes a security interest in "rents in the premises" alone, the mortgage is not within the scope of § 1322(b)(2) in light of *Sapos* ).

ing appellate decision-making.[6] This reasoning thus extends *Nobelman* beyond its express contours and creates an artificial conflict between *Nobelman* on one hand and *Wilson* and *Sapos* on the other.

Although we reiterate our holding in *Hirsch I* that a mortgagee's taking a security interest in personalty as described in *Wilson* and *Sapos* eliminates application of § 1322(b)(2), we nevertheless note that even this exception to *Nobelman* is itself under attack in *Hirsch II*. The *Hirsch I* reasoning is no help to the Plaintiffs here, where no allegation of a security interest in personalty has been made. As a result, the Plaintiffs are presented with a formidable and perhaps insurmountable hurdle in *Nobelman*.

### 3. THE PLAINTIFFS CANNOT PREVAIL IN THIS PROCEEDING UNDER ANY THEORY ARTICULATED BY THEM, OR ANY OTHER KNOWN THEORY.

The foregoing survey of the past and present status of claim bifurcation in Chapter 13 cases in this jurisdiction, and particularly the *Taras* decision upon which the Plaintiffs rely, tends, if anything, to illuminate the weakness of their position. It is true that the weakness of their position is due to bad timing in raising the bifurcation issue. Since they filed and obtained a discharge in their bankruptcy case before *Dewsnup* overruled *Gaglia*, they could have bifurcated Household's claim in the course of the 1990 Case. However, having failed to have filed the adversary proceeding necessary to do so, the lien remained. As *Taras* points out, it is doubtful that *Dewsnup* could or would be held to retroactively invalidate rulings which were handed down before *Gaglia* was overruled. However, it would also be inappropriate to decide the instant proceeding on the premise

that a non-existent proceeding could have been successfully filed in 1990, especially since such a proceeding could not have been successfully filed at any time after January 15, 1992, when *Dewsnup* was decided.

The Plaintiffs also had at their disposal the possibility of filing a Chapter 13 case and obtaining bifurcation of Household's claim, irrespective of whether a security interest was taken by Household in their personalty, on the basis of the prong of reasoning in *Wilson* and *Sapos* which prevailed in this Circuit until *Nobelman* was decided. However, once *Nobelman* was decided, their only apparent possibility of escaping its result and avoiding the impact of § 1322(b) was arguing, *qua Hirsch I*, that Household retained a security interest in property other than the Home itself. They do not even advance this argument, and it appears, from our examination of the loan document and mortgage, that no security in addition to that taken by Household in the Home itself has been taken which would justify their avoiding the effect of § 1322(b)(2) on this ground.

Instead, the Plaintiffs advance the novel argument that their prior Chapter 7 discharge allows them to escape the effect of *Nobelman* and § 1322(b)(2). Although they cite *Taras* in support of this argument, clearly the result in *Taras* is distinguishable. What permitted the *Taras* debtors prior case, converted to Chapter 7, to give rise to *res judicata* effect was the presence of a judgment in their favor in the prior adversary proceeding, bifurcating the mortgagee's claim. Here, the Plaintiffs filed no comparable proceeding in the 1990 Case, and thus no element of *res judicata* from the 1990 Case arises in their favor.

We also note that, in subsequent development of the *Nobelman* decision, several

---

**6.** In this regard, we note that Judge Dalzell, who decided *Hirsch II*, affirmed, in a post-*Nobelman* decision in *In re Oglesby*, 158 B.R. 602, 606 (E.D.Pa.1993), this court's decision in *In re Oglesby*, 150 B.R. 620, 624–25 (Bankr.E.D.Pa. 1993), in which we held that a security interest in the mortgagor's oven, dishwasher, fan vent, and "rents, issues, and profits" eliminated application of § 1322(b)(2) despite the entry of a pre-petition foreclosure judgment against that debtor. These issues are precisely those upon which

Judge Dalzell now "reverses himself" and holds that § 1322(b)(2) *does* apply. This statement is made not so much to point out the very human inconsistencies that can creep into decision-making, but that Judge Dalzell did not, in all probability, take note of his "decision" on these issues in *Oglesby* because he did not address them. The important inconsistency is attributing the *Nobelman* Court with having decided issues that it has not similarly discussed in its opinion.

courts have determined that a mortgagee which is not a first mortgage holder is nevertheless entitled to the anti-modification protection described in *Nobelman* as long as its claim is not wholly unsecured. *See, e.g., In re Reeves*, 164 B.R. 766, 767 (Bankr. 9th Cir.1994) ("Section 1322(b)(2) makes no distinction between short term and long term loans or types of lenders."); and *In re Lee*, 161 B.R. 271, 273–74 (Bankr.W.D.Okla.1993) ("The holding of *Nobelman* continues to apply to all undersecured, as opposed to wholly unsecured, second and subsequent mortgages, irrespective of the degree to which they are undersecured or of the nature of the transaction in which the lien was obtained.").

There is, however, a developing line of cases which holds that, when the claim of a home mortgage lender is wholly unsecured, the debtor may modify the claim by treating it as an unsecured claim. *See, e.g., In re Sette*, 164 B.R. 453, 455 (Bankr.E.D.N.Y.1994) ("The second mortgage holders in this case are totally unsecured pursuant to the meaning of Section 506(a) of the Code, and may have their rights modified under Section 1322(b)(2)."); *In re Moncrief*, 163 B.R. 492, 493–94 (Bankr.E.D.Ky.1993) ("As this court reads the opinion of the Supreme Court in *Nobelman* ..., the claim of [the second mortgage lender] must be at least partially secured by a security interest in the debtors' residence in order to preclude modification of the claim under 11 U.S.C. § 1322(b)(2)."); *Lee, supra*, 161 B.R. at 273 ("Since it is conceded in this case that the value of the residence is less than the amount due under the first mortgage, [the] second mortgage is wholly unsecured, and [the second mortgagee] is therefore the holder of only an unsecured claim."); and *In re Plouffe*, 157 B.R. 198, 200 (Bankr.D.Conn.1993) ("I find it evident from the *Nobelman* ruling that a homestead mortgagee to claim the protection against modification granted by § 1322(b)(2), the mortgagee must quality as the holder of a secured claim to some extent as determined by § 506(a)."). *Accord, In re Kidd*, 161 B.R. 769, 770–71 (Bankr.E.D.N.C.1993); *In re Williams*, 161 B.R. 27, 29–30 (Bankr. E.D.Ky.1993); and *In re Hornes*, 160 B.R. 709, 711–14 (Bankr.D.Conn.1993).

■ Unfortunately for the Plaintiffs, the record clearly establishes that Household is not wholly unsecured. It was agreed by the Plaintiffs that, for purposes of the determination of the Proceeding, it could be assumed that Anchor, the first mortgagee of the Home, has a claim secured against the Home in the amount of $190,000. Indeed, the Debtor suggests, in defending the Anchor Motion, that, if anything, this claim is exaggerated. Furthermore, although the Husband testified that the Property is worth $194,000, Household's appraiser has valued it at $200,000. Thus, there appears to be at least $4,000 worth of equity in the Property after the lien of Anchor. Although the secured portion of Household's claim pales in comparison to its total claim of over $129,000, even the smallest amount of security in the Debtor's principal residence would appear to be sufficient, under the teaching of *Nobelman*, to prevent the Plaintiffs from modifying Household's claim.

■ No reason is given by the Plaintiffs to support their argument that this result can be avoided due to the fact that the Plaintiffs' personal liability on the Household debt was discharged in a previously Chapter 7 bankruptcy case. The one reported case located by this court which entertained such an apparent contention ruled to the contrary. *See In re Dydo*, 163 B.R. 663, 664 (Bankr. D.Conn.1994) ("The debtors' argument that *Nobelman* only applies to mortgage debts where personal liability on the entire debt obtains is not supported by any of the language in the *Nobelman* opinion."). *Cf. In re Hutchins*, 162 B.R. 1014, 1019–20 (Bankr. N.D.Ill.1994) (the Chapter 7 discharge of a debt held by even a wholly undersecured creditor was held precluded by judicial estoppel because the debtor failed to list that creditor).

Logically, also, the Plaintiffs' position makes no sense. It would allow debtors to avoid entirely any adverse effect of § 1322(b)(2) by the vehicle of filing a "Chapter 20" case, *i.e.*, a Chapter 7 case followed immediately by a Chapter 13 case. While the Supreme Court held, in *Johnson v. Home State Bank*, 501 U.S. 78, 85–88, 111 S.Ct. 2150, 2155–56, 115 L.Ed.2d 66 (1991), that

Chapter 20 cases are not prohibited *per se*, nowhere does *Johnson* or any other case suggest that Chapter 20 filings should be thus favored. *Compare In re Sunderland*, 157 B.R. 39 (Bankr.M.D.Fla.1993) (Chapter 20 filings are subject to intensified scrutiny).

Many courts have commented on the incongruous results which follow from the *Nobelman* analysis when the home mortgagee is secured by only "one dollar or perhaps one penny." *Moncrief, supra*, 163 B.R. at 494, an observation which seems appropriately applied to the instant factual context. The court in *Lee, supra*, 161 B.R. at 273, provides a thoughtful critique of this situation:

> This court is aware that the application of this holding may bear results that appear somewhat incongruous in some cases. Under this reading of *Nobelman*, the rights of a mortgagee which is the holder of a secured claim *in any amount*, however slight, may not be modified in any way if that claim is secured only by a security interest in real property that is the debtor's principal residence.
>
> It is easy to envision a scenario involving a creditor holding a claim which arose from a transaction wholly unrelated to the financing of debtors' residence, but in connection with which it demanded and received a second or subsequent lien on debtors' residence. In such a case, if the amount of the creditor's secured claim, as determined under § 506(a), was as little as one dollar, this reading of *Nobelman* would prohibit the modification of the creditor's rights in any particular. In many cases, the presence of such an undersecured claim, and debtors' inability to modify the creditor's rights, would deal a final blow to debtors' ability to propose a confirmable Chapter 13 plan, or to save their home (emphasis in the original) (footnote omitted).

*Accord, Hornes, supra*, 160 B.R. at 716 ("It might also be argued, with some merit, that the holding in the instant proceeding could result in the rights of a holder of an undersecured claim with only a penny of value being fully protected by the other than clause [of § 1322(b)(2) ], while the rights of a holder of a claim which is unsecured by only a penny would be subject to modification.").

On the other hand, any time that a bright-line test is established whereby full relief is granted if a party falls on one side of the line, and no relief is granted if the party falls on the other side of the line, difficult, if not absurd, results sometimes follow when the facts of the case place a party very close to that line. We are reminded of the old adage that "hard cases make bad law." Be that as it may, even if we disagree with the line drawn or line-drawing generally in this context, we would be powerless to change it. That responsibility belongs to the legislature. *Accord Lee, supra*, 161 B.R. at 274 ("The [resolution of the] apparent incongruity described above ... is not for the courts in any event. The Congress, should it desire to limit the protections of § 1322(b)(2), to first mortgage liens or otherwise, certainly knows how to do so.").

We also note the following observation of Judge Cosetti in *Heckman, supra*, 165 B.R. at 17, commenting upon the fact that the crucial application of § 1322(b)(2) depends upon such an apparently irrelevant and incidental circumstance of whether security is taken by the mortgagee in a certain type of personalty:

> This Court believes that [the mortgagee's] arguments [that a security interest in rents should not preclude application of § 1322(b)(2) ] have merit if the standard were one of logic. However, the standard is the interpretation of a statute and the Court of Appeals precedents.

We would only amend this statement to observe that the Court of Appeals, the district court, and this court are merely left with the task of interpreting language chosen by Congress. Only Congress can change the language of § 1322(b)(2) or of any other Code provision.

Notably, the Plaintiffs do not cite to the principles enunciated in, or cite to, any of the line of cases referenced at page 378 *supra*. Sad to say, had they let the record from the March 1, 1994, hearing remain intact, they would have had a stronger argument that this line of cases would control here than the present record allows. Had the value of the

Property been established at the $180,000 to $185,000 range related by the Husband at that hearing, and Anchor's claim had been fixed at $190,000, Household's claim would have been established as totally undersecured. Of course, Household did place on the record the testimony of its appraiser valuing the Home at $200,000, which, had it been necessary for us to so hold, we might have decided supported the conclusion that Household's claim was not totally undersecured. Also, if the Plaintiffs are permitted to continue to allow Anchor's claim to grow by nonpayment, and if the value of the Home continues to decline or does not increase, the Plaintiffs may be able to successfully invoke that line of cases at some later point.

As noted above, the only argument clearly articulated by the Plaintiffs in their Complaint is their 11 U.S.C. § 522 argument. In making this argument, we note that the Plaintiffs appear to assert that Household's lien impairs the Debtor's exemption and may therefore be avoided pursuant to 11 U.S.C. § 522. We assume that Debtor is referring to § 522(f)(1) which states, in pertinent part, that

> [n]otwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is ... a judicial lien....

■ However, contrary to the Plaintiffs' assertions, Household's lien is not a judicial lien; it is a consensual, mortgage lien. Household has not even obtained a judgment on its mortgage debt, and the Bucks County Recorder book and page number cited by Debtor as the place where the "judgment" was "entered of record" is actually the location of recordation of Household's second mortgage. As we point out in, *e.g., In re Aikens,* 87 B.R. 350, 353–54 (Bankr.E.D.Pa. 1988), only a judicial lien, and not a consensual lien, may be avoided pursuant to § 522(f)(1).

Nor have we found any authority for the proposition, suggested by the Debtor in the Objection, that a mortgage lien becomes a judicial lien as a result of a Chapter 7 discharge order. Indeed, if this were so, it could not be said that a mortgage lien will pass through a Chapter 7 discharge *unaffected. See Dewsnup, supra,* —— U.S. at ——, 112 S.Ct. at 778. Finally, even were we to determine that Household's lien is a judicial lien, one court has held that a judicial lien which is secured only by the Debtor's principal residence may not be avoided even if it is completely undersecured as a result of a prior first mortgage lien and the debtor's exemptions. *See In re Johnson,* 160 B.R. 800, 801, 803 (S.D.Ohio 1993). *But cf. Klein, supra,* 106 B.R. at 401–02.

The Plaintiffs have therefore advanced no theory which would allow us to avoid the lien of Household or bifurcate its claim, nor does any theory not raised by the Plaintiffs yield such a result. The Proceeding must therefore be dismissed.

## 4. THE DEBTOR MUST PROPOSE A CONFIRMABLE PLAN CONSISTENT WITH THIS ORDER, OR FACE DISMISSAL OF THIS CASE.

Obviously, our disposition of the Proceeding means that the Debtor will be unable to confirm her plan in its current form. However, since it is only upon our making this ruling that the Debtor's plan is rendered infeasible, we will postpone a final ruling on the Relief Motions in order to give the debtor a chance to propose an amended plan which can be confirmed even in light of this decision.

We are cognizant of the Husband's testimony that the Plaintiffs would be unable to propose a plan which cures the arrearages on both Anchor's mortgage loan and Household's mortgage loan while making ordinary payments to both lenders. We also note that the Anchor loan is admittedly at least 40 months in arrears; the Debtor has made no post-petition payments to Anchor; and the Husband contended, although possibly merely to provide some reasonably-sympathetic response to our inquiry as to why no payments were made, that the Plaintiffs were unable to pay their attorney's fees, the Chapter 13 Trustee payments, and the loan pay-

ments to Anchor all at once. Thus, although we will give the Debtor an opportunity to propose a modified plan, we have considerable doubt that she will be able to do so, and we are therefore compelled to require the Debtor to act in a rather short time-period.

We will therefore require the Debtor to propose, file, and serve a confirmable plan, consistent with this Opinion, on or before May 27, 1994, or we will dismiss this case at a continued confirmation hearing of June 23, 1994. The Relief Motions will be carried to that date, *i.e.*, June 23, 1994, and will of course be effectively granted if the case is dismissed.

## D. CONCLUSION

An Order reflecting the results reached in this Opinion will be entered.

### ORDER

AND NOW, this 18th day of May, 1994, after a consolidated trial of the above adversary proceeding ("the Proceeding") and hearings on the Motions of Household Realty Corp. ("Household") ("the Household Motion") and of Anchor Mortgage Services, Inc. ("Anchor") ("the Anchor Motion") for relief from the automatic stay and the Debtor's Objection to Household's claim (subsequently withdrawn) ("the Objection") filed in the main case on April 21, 1994, and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of Household and against the Plaintiffs in the Proceeding. The Complaint in the Proceeding is therefore DISMISSED in its entirety.

2. The Objection is DENIED, since it was agreed that it may be withdrawn and because it must fall with the Complaint.

3. Consistent with Local Bankruptcy Rule 3019.1(a), the Debtor shall file and serve on all interested parties an amended plan consistent with this Opinion on or before May 27, 1994.

4. The presently scheduled confirmation hearing of May 19, 1994, is postponed, and a hearing to consider confirmation of any amended plan filed, as well as a final hearing

on the Household Motion and the Anchor Motion, shall be scheduled on

THURSDAY, JUNE 23, 1994, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. If no further amended plan is filed and served as directed herein, or if the Debtor is unable to confirm her amended plan on June 23, 1994, for any reason, this case will be dismissed on that date.