In re Brenda A. COLE, Debtor.

Brenda A. COLE, Plaintiff,

v.

CENLAR FEDERAL SAVINGS BANK, Edward Sparkman, Trustee, Defendants.

Bankruptcy No. 90–10672DAS.
Adversary No. 96–0964DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 6, 1996.

**376**

Roger V. Ashodian, Delaware County Legal Assistance Association, Chester, PA, for Debtor.

Gary E. McCafferty, Philadelphia, PA, for Cenlar Federal Savings Bank.

Edward Sparkman, Standing Chapter 13 Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") requires this court to determine whether the debtor and plaintiff, BRENDA A. COLE ("the Debtor"), is entitled to a discharge under 11 U.S.C. § 1328(a) and, if so, what the amount of her post-discharge obligation will be to her residential mortgagee, defendant CENLAR FEDERAL SAVINGS BANK ("Cenlar"). In addition to factual issues regarding the distribution of the Debtor's plan payments by defendant EDWARD SPARKMAN, the standing Chapter 13 trustee ("the Trustee"), towards, principally, mortgage arrears payable to Cenlar and post-petition payments to Cenlar, two legal questions emerge: (1) whether Cenlar entitled to adjust the balance owed to account for escrow deficits when it failed to adjust the Debtor's monthly payments during the post-petition period; and (2) whether the Debtor entitled to adjust the principal balance owed to Cenlar to account for our post-petition reduction of the secured portion of Cenlar's claim under 11 U.S.C. § 506 in our former decision in this case, *In re Cole*, 122 B.R. 943, 945, 947–48 (Bankr.E.D.Pa. 1991) ("*Cole I*"), *aff'd*, C.A. No. 91–1578 (E.D.Pa. May 22, 1991),[1] in light of the subsequent decisions in *Nobelman v. American*

Savings Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); and *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

We resolve the legal issues by holding that (1) the Debtor's Chapter 13 plans do not set forth her post-petition obligations to Cenlar with sufficient specificity to bar Cenlar's escrow adjustment; and (2) the subsequent decisions in *Nobelman* and *Dewsnup* cannot be applied to overturn the *res judicata* effect of our final unappealed § 506 determination in *Cole I*. The factual issues, difficult to resolve on the basis of the inconclusive record, lead us to conclude that the Debtor is entitled to a discharge under § 1328(a) and that her post-discharge mortgage balance should be fixed at $20,035.86.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying individual Chapter 13 bankruptcy case on February 14, 1990. Her Second Amended Plan ("the 2nd Plan"), prepared in conformity with *Cole I*, 122 B.R. at 952, was filed on January 18, 1991. In *Cole I*, we bifurcated Cenlar's undersecured claim against the Debtor's residence at 630 Columbia Avenue, Darby, Pennsylvania 19023 ("the Home"), of $45,352.74, inclusive of arrears, into a secured claim consisting of the $34,000 value of the Home and an unsecured claim of $11,352.74 for the balance, pursuant to 11 U.S.C. § 506. *Id.* at 947–48.

The 2nd Plan called for tiered payments of $15 monthly for ten months, $150 monthly for twelve months, $225 monthly for eighteen months, and $471.56 monthly for twenty months, totaling $15,431.20. Plan completion, however, was said to require payments of no more than $14,081.16. The 2nd Plan therefore apparently provided for a $1,350.04 "cushion."

It is important to note that neither the 2nd Plan nor its predecessors make mention of post-petition payments to Cenlar, nor does it provide that the Trustee's distribution is to

---

**1.** The only appeal from *Cole I* was by the Debtor, to that portion of the decision, 122 B.R. at 948–51, which refused to reduce her arrearages despite the bifurcation of Cenlar's secured claim under 11 U.S.C. § 506. That particular issue is not relevant to the Proceeding presently before us.

be made to any specific creditors. There is a reference to "special treatment" of creditors pursuant to an "attached 'Schedule of Debts,'" but no such "Schedule of Debts" is attached. The parties apparently interpreted the 2nd Plan as providing that only payments of priority and administrative claims and Cenlar's secured "claim" for mortgage arrears would be distributed by the Trustee. There is not even any statement in the 2nd Plan requiring post-petition payments to Cenlar, but the parties apparently assumed that such payments would have to be made under a Chapter 13 plan which cured mortgage arrears.

The 2nd Plan was confirmed on February 13, 1991. The parties agree that it required the Debtor to cure arrears owed to Cenlar in the amount of $12,801.05, pay $273.55 in County taxes, and pay the Trustee compensation totaling $889.97, or 6.8% of Plan disbursements. Therefore, the total payments required under the 2nd Plan was in fact only $13,963.67, thus further increasing the "cushion."

There was virtually no activity in the case after confirmation for over three and a half years, until August 2, 1994, when the Trustee filed a motion to dismiss this case because of the Debtor's delinquency in plan payments. The Debtor, in testimony at the trial of the Proceeding, attributed the delinquency to an automobile accident in April 1994 which prevented her from working and resulted in the termination of her payments, which had previously been made through wage attachments. In response, the Debtor, on August 9, 1994, filed a Motion to Abate Arrears and to Modify Plan After Confirmation ("the Abatement Motion"). In the Abatement Motion, the Debtor alleged that, prior to her disability, her employer had erroneously made payments totaling $3,539.89 directly to Cenlar instead of remitting these payments to the Trustee for plan payments. These payments caused Cenlar's post-petition payments to be paid ahead, but the plan payments to be seriously in arrears.

On September 13, 1994, after a hearing at which the Abatement Motion was not opposed by Cenlar and opposed only mildly by the Trustee, we granted the Abatement Motion ("the 1994 Order"). Pursuant thereto, we adjusted Cenlar's total arrearages to a reduced amount of $9,216.16 from $12,801.05, and adjusted the total payment amount due to $9,863.14. We also allowed the Debtor to extend payments for a year beyond the normal 60-month plan duration, through February 1996. This extension, though extraordinary, was deemed necessary because of an anticipated reduction in the Debtor's income and an anticipated delay in the Debtor's receipt of disability benefits.[2]

In any event, the Trustee withdrew his motion to dismiss the case in light of the 1994 Order. He later withdrew a subsequent similar motion filed on October 24, 1994. The only activity over the next year was this court's listing of the case on July 18, 1995, with all of our Chapter 13 cases open over five years after their filing, for a hearing to show cause why this case should not be dismissed for possible failure to make necessary plan payments. When the extension of the Debtor's plan through February 1996, pursuant to the 1994 Order, was called to our

---

**2.** In entering the 1994 Order, we recognized the presence of authority holding that, for purposes of plan modification, the 60-month limit set forth in 11 U.S.C. § 1322(d) (formerly 11 U.S.C. § 1322(c)) should be found to run from the date of the first payment after confirmation, rather than the date of filing. *See West v. Costen,* 826 F.2d 1376, 1378 (4th Cir.1987); and *In re Eves,* 67 B.R. 964, 966–67 (Bankr.N.D.Ohio 1986). Under that reasoning, the plan could be extended for five years from February 1991, when the first payment was made after confirmation. However, in most instances, most courts, including this court, in *In re Cobb,* 122 B.R. 22, 27 (Bankr. E.D.Pa.1990), have measured the 60–month period in § 1322(d) by reference to the date of the

filing of the case. *See, e.g., In re Nicholes,* 184 B.R. 82, 87 (Bankr.9th Cir.1995); *In re Evans,* 183 B.R. 331, 332–33 (Bankr.S.D.Ga.1995); *In re Cutillo,* 181 B.R. 13, 16 (Bankr.N.D.N.Y.1995); *In re Neill,* 158 B.R. 93, 97 (Bankr.N.D.Ohio 1993); and *In re Duckett,* 139 B.R. 6, 8–9 (Bankr. E.D.Tex.1992).

We allowed the Debtor a dispensation in order to allow her to preserve the rulings in *Cole I* in the face of circumstances causing her delinquency which were beyond her control. The complications which have arisen, attributable partly to the long duration of bankruptcy supervision of the Debtor's relationship with Cenlar, attests to the wisdom of keeping this period short.

attention, we relisted the show cause hearing on April 2, 1996.

On October 20, 1995, Cenlar filed a motion seeking relief from the automatic stay, alleging that it was not receiving post-petition mortgage payments. This motion was settled by a Stipulation approved by this court on January 12, 1996 ("the 1996 Stip."). The 1996 Stip., to the extent that it is legible due to interdelineations, provides in pertinent part that the "post-petition arrearages" on Cenlar's mortgage "are between $1,556.48 and $1,945.60," apparently due to a dispute over whether the Debtor made one particular mortgage payment of $389.12. It further recites that the Debtor will pay Cenlar, on or before March 31, 1996, the sum "between $1,556.48 and $1,945.60 ... as agreed between the parties after reviewing the loan history."

The show cause hearing was continued from April 2, 1996, to June 27, 1996, at the request of the Trustee, who indicated the existence of a dispute over distribution of the plan payments. Shortly before the latter date, on June 21, 1996, the Debtor filed a document in opposition to dismissal of her case and in support of her discharge in which she alleged, *inter alia*, that the Trustee had mistakenly overlooked the 1994 Order and was erroneously requiring her to pay him the amount called for by the 2nd Plan to receive her discharge. After a further continued show cause hearing of July 18, 1996, the Debtor was directed, memorialized by an Order of July 19, 1996, to file an adversary proceeding to recoup any payments allegedly erroneously distributed by August 1, 1996, and a trial on any such proceeding was scheduled on September 12, 1996.

The Proceeding was filed in response thereto on August 1, 1996, in the form of a Complaint to Determine Secured Status and for Recovery of Overpayments Under Chapter 13 Plan ("the Complaint"). The Complaint alleges, and available evidence confirms, that neither the Trustee nor Cenlar recorded the 1994 Order in their records. This failure to record the 1994 Order allegedly caused the Trustee to quote an inaccurate payoff amount to the Debtor, which resulted in a net overpayment to Cenlar under the Plan. Specifically, the Complaint alleged that Cenlar received a $2,684.57 overpayment and that the Trustee retained $274.29 in unmerited commissions. The Debtor sought, in the prayer for relief, a declaration that her mortgage payments to Cenlar were current, that the balance be fixed at an amount "no greater than $26,384.02," and that the Trustee refund $274.29 in allegedly overpaid commissions to her.

The parties were granted a continuance of the trial from September 12, 1996, to September 26, 1996, on a must-be-heard basis. On the latter date, they attempted to obtain a further continuance due to the Debtor's absence to attend a work-training program. When initially denied any further dispensation, the parties attempted to make a paper record and submitted numerous exhibits, mostly pleadings from this case; the Trustee's payment and disbursement records, stipulated to be accurate; and Cenlar's payment records. However, they ultimately requested, and were reluctantly granted, an opportunity to call the Debtor as a trial witness on October 3, 1996.

At that trial of October 3, 1996, the Debtor described her disabling automobile accident and its devastating effect on her income. On cross-examination, she admitted receipt of annual statements indicating increases in her real estate taxes from about $1,300 in 1992 to about $1,450 in 1995. Finally, the Debtor testified that in March 1996, apparently upon receipt of retroactive disability benefits, she paid $7,209 to the Trustee. Her counsel later conceded that the Trustee's records showing receipt of only $6,209 at this time were accurate.

After the trial the parties were permitted to simultaneously file opening briefs in support of their respective positions by October 16, 1996, and reply briefs by October 23, 1996. We found the opening briefs sketchy, and in some respects inconsistent with the pleadings of record. Cenlar's brief appeared to assume that the arrearages to be distributed to it remained at $12,801.05, irrespective of the 1994 Order. It therefore argued that the Trustee's distribution of $11,945.73 to it, per his undisputed records, left Cenlar with an arrearage balance due of $855.32. It also

claimed that the Debtor owed it $389.12 in post-petition payments, although admitting receipt of the $1,556.48 figure referenced as the low range of the delinquent post-petition payment balance in the 1996 Stip. and all regular mortgage payments due after the 1996 Stip. In its legal argument, Cenlar contended that the § 506 determination in *Cole I* must be disregarded as contrary to *Dewsnup, supra,* and that its entire $29,534.37 principal balance remained payable. Cenlar conceded that its recorded "escrow overdraft" of $7,394.31 should be reduced to $3,125.44 because it had erroneously added accrued attorney's fees, and had failed to make the non-§ 506 adjustments ordered in *Cole I.* It also allowed for a credit of $698.38 on account of the arrearages and post-petition payments owed which had already been added into the $29,534.37 balance. Further adding on a mortgage insurance premium of $12.38 and "accrued late charges" of $1,055.86, Cenlar computed the balance due to be $33,728.05. It prayed that the Debtor be ordered to pay Cenlar $1,244.44 (the $855.32 arrearage delinquency plus $389.12, the post-petition payment delinquency) in order to complete her plan and obtain her discharge, and that its post-discharge lien be fixed at $33,728.05.

The Debtor's calculations were quite different. She began with Cenlar's requested $29,534.37 balance, but contended that this figure must be reduced by the $11,352.74 portion of Cenlar's claim found unsecured in *Cole I* and the $2,684.57 which she claimed, in the Complaint, was overpaid to Cenlar in arrearages. ,She contended that this left a balance due of "no greater than $15,497.06." The large discrepancy between this figure and the $26,384.02 figure referenced in the Complaint is neither mentioned nor explained. The Debtor further asserted that allowance of any "escrow deficit" to Cenlar should be denied, contending that decisions in *In re Washington,* 158 B.R. 722 (Bankr. S.D.Ohio 1993); *In re Conway,* 126 B.R. 28 (Bankr.D.Del.1991); and *In re Brown,* 121 B.R. 768 (Bankr.S.D.Ohio 1990), supported a bar of any such recovery.

Upon review of these briefs, we entered an order of October 21, 1996, seeking to focus the reply briefing as follows:

1. Cenlar is directed to explain why it continues to claim that the arrearages remain $12,801.05 in light of [the 1994 Order] reducing the arrears to $9,862.14 [sic—the figure should be $9,216.16].

2. The Debtor and the Trustee are requested to address the issue of the Trustee payments made and disbursed by the Debtor in this case, and the Debtor is directed to address the issue of the direct payments to Cenlar.

3. The Trustee is directed to provide at least a short, plain statement as to how he believes that this proceeding should be resolved and why.

In response to this Order, Cenlar submitted a basically inscrutable explanation which may be, in substance, that it continued (and perhaps continues) to credit the $3,584.89 difference between the $12,801.05 and $9,216.16 figures towards post-petition delinquencies.

The Debtor, in a brief shortly thereafter supplemented by over two pages of "addendum/errata," cites a few cases for the principles that (1) the confirmed plan(s) is (are) *res judicata* of any claims of Cenlar inconsistent therewith; and (2) bifurcation under § 506 was permissible despite *Nobelman* and *Dewsnup,* even in Chapter 13 cases where a debtor seeks to cure arrears.

The Trustee submitted a letter in which he principally sought to avoid his liability to refund any commissions. He contended, with significant justification, that the Debtor's various plans were ambiguous regarding distributions to any parties other than Cenlar. The Trustee stood by his report indicating that the Debtor paid a total of $13,095.55, of which $11,945.73 was distributed to Cenlar, and $273.55 was distributed to the County of Delaware on a priority tax claim. We infer that the net balance of $875.27 was retained as commissions. The Trustee apparently believes that the distribution to Cenlar in excess of the amount specified in the 1994 Order was not prejudicial because it was credited to the post-petition payment balance owed by the Debtor to Cenlar.

## C.  DISCUSSION

1. *THE COLE I DECISION FIXING CENLAR'S SECURED CLAIM STANDS TO REDUCE THE BALANCE OF THAT CLAIM IRRESPECTIVE OF THE INTERVENING DECISIONS IN DEWSNUP AND NOBELMAN.*

At the time that *Cole I* was rendered, it was established in this Circuit that debtors in both Chapter 13 cases, see *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3d Cir.1990); and Chapter 7 cases, see *Gaglia v. First Federal Savings & Loan Ass'n,* 889 F.2d 1304 (3d Cir.1989), could utilize 11 U.S.C. § 506 to bifurcate undersecured claims into a secured claim equal to the value of the collateral and an unsecured claim for the balance. *Wilson* was, moreover, consistent with earlier decisions of this court applying § 506 for this purpose in Chapter 13 cases, see *In re Jablonski,* 70 B.R. 381, 385–86 (Bankr.E.D.Pa.1987), *aff'd in part & remanded in part,* 88 B.R. 652 (E.D.Pa.1988), citing *In re Everett,* 48 B.R. 618 (Bankr. E.D.Pa.1985); and *Gaglia* was consistent with our prior decision applying § 506 in this manner in Chapter 7 cases. *See In re Mays,* 85 B.R. 955, 958–60 (Bankr.E.D.Pa.1988), *aff'd,* 1988 WL 81716 (E.D.Pa. August 3, 1988).

Within a month after the Supreme Court's decision in *Dewsnup, supra,* on January 15, 1992, this court addressed the impact of that decision on *Wilson* and *Gaglia* in *In re Taras,* 136 B.R. 941 (Bankr.E.D.Pa.1992). In *Taras,* we expressed our belief that, while *Dewsnup* had overruled *Gaglia, id.* at 947, 948; *accord In re Gelletich,* 167 B.R. 370, 373–74 (Bankr.E.D.Pa.1994), it had not overruled *Wilson,* which authorized § 506 to be used to bifurcate a secured claim in a Chapter 13 case, but only in those circumstances where the debtor proposed to liquidate the entire secured portion of the bifurcated claim in a Chapter 13 plan. *Id.* at 949–50. In so holding, we noted that in our view *Dewsnup* precluded bifurcation in a Chapter 13 case in which the plan cured mortgage arrearages

rather than liquidating the entire secured claim, *id.* at 950, citing our decision in *In re Blakeney,* 126 B.R. 449, 459–61 (Bankr. E.D.Pa.1991), as an example of a decision which we believed was now barred by *Dewsnup.* In bifurcating Cenlar's claim in *Cole I,* we proceeded exactly as we had in *Blakeney,* thereby rendering this aspect of the *Cole I* decision a process which, in *Taras,* we held was inconsistent with *Dewsnup.*

Our prognosis that *Dewsnup* did not overrule *Wilson* was fulfilled in *Sapos v. Provident Institution of Savings in Town of Boston,* 967 F.2d. 918 (3d Cir.1992).[3] *See Gelletich, supra,* 167 B.R. at 374. However, on June 1, 1993, the Supreme Court decided *Nobelman, supra,* which held that the use of § 506 in Chapter 13 cases was not contrary to 11 U.S.C. § 1322(b)(2), thus precluding the use of § 506 in any situation in which § 1322(b)(2) applied.

However, as we noted in a decision rendered within a month after the decision in *Nobelman, In re Hirsch,* 155 B.R. 688, 689–90 (Bankr.E.D.Pa.1993), *rev'd,* 166 B.R. 248 (E.D.Pa.1994), *Nobelman* did not carry over the broad holding of *Dewsnup* that § 506 could not be utilized in a Chapter 7 case to Chapter 13 cases. *Accord, Gelletich, supra,* 167 B.R. at 374–75. We therefore predicted, in *Gelletich, supra;* and *Hirsch, supra,* that bifurcation would remain possible in Chapter 13 cases where the mortgagee's security included collateral other than the Chapter 13 debtor's home itself and § 1322(b)(2) did not apply. Although the *Hirsch* decision was itself reversed, its conclusion in this regard, reiterated in *Gelletich, supra,* 167 B.R. at 374–77, was vindicated in this Circuit in *In re Johns,* 37 F.3d 1021 (3d Cir.1994); and *In re Hammond,* 27 F.3d 52 (3d Cir.1994). The issue has never reached the Supreme Court.

The foregoing history relates the flux that has occurred in this area of the law between the date of our decision in *Cole I* and the present. In light of *Dewsnup,* we would no longer bifurcate Cenlar's claim in a Chapter 13 case in which the Debtor's plan seeks only

---

**3.** *Sapos* also addressed and approved our holding in *Cole I,* 122 B.R. at 948–51, that the debtor could not reduce the arrearages otherwise payable through her § 506 claim.  967 F.2d at 926–28.

to cure arrearages. On the other hand, Cenlar's security interest in the Debtor's appliances and household furnishings, though viewed as "irrelevant" in *Cole I*, 122 B.R. at 949, would permit the Debtor to bifurcate Cenlar's claim if her plan(s) had proposed to liquidate Cenlar's entire claim.

■ An issue not addressed in any of the foregoing cases is what effect the § 506 bifurcation will have on the undersecured creditor's claim after the bankruptcy is over. It now appears well-established that completion of a plan which pays off the entire secured portion of a bifurcated claim requires the undersecured creditor to release its lien. *See Bank One, Chicago, NA v. Flowers*, 183 B.R. 509, 516 (N.D.Ill.1995); *In re Hernandez*, 175 B.R. 962, 963–67 (N.D.Ill.1994); *In re Lee*, 162 B.R. 217 (D.Minn.1993); *In re Nicewonger*, 192 B.R. 886, 889–90 (Bankr. N.D.Ohio 1992); *In re Dupree*, 183 B.R. 270, 282–85, *reconsidered in part on other grounds*, 188 B.R. 991 (Bankr.W.D.Okla. 1995); *In re Wilson*, 174 B.R. 215, 218–22 (Bankr.S.D.Miss.1994); *In re Mandrayar*, 174 B.R. 289, 291–93 (Bankr.S.D.Cal.1994); and *Washington, supra*, 158 B.R. at 724. *Cf. Harmon v. United States*, 184 B.R. 352, 354–55 (D.S.D.1995) (Chapter 12 case).

We agree with the reasoning of these cases. We note that a contrary result would render the § 506 process a meaningless exercise without any effect in the debtor's financial affairs outside of the world of bankruptcy. The purpose of bankruptcy intervention is to provide pervasive control over a debtor's affairs while the debtor remains in bankruptcy *and* directives, regarding those affairs, which will, like discharges, survive the bankruptcy. These directives are intended to provide the debtor, permanently strengthened thereby, a "fresh start" in the world in which state law and state events will probably resume their role in regulating the former debtor's financial affairs. We therefore must assume that, when a debtor-mortgagor who has utilized § 506 in his bankruptcy case arrives in the state law world, that law will recognize that the mortgagee's claim is altered under applicable state law.

■ We believe that a § 506 determination in Chapter 7 cases and Chapter 13 cure-plan cases which preceded *Dewsnup* must have the same effect as the § 506 determination in a contemporary Chapter 13 case in which the secured portion of a claim is liquidated in a plan. Although the secured claim is not discharged in a Chapter 7 case or in a Chapter 13 plan which does not liquidate it, *see* 11 U.S.C. § 1328(a)(1) and page 383 *infra*, it seems clear that the reduction of the secured portion of the bifurcated claim should reduce the amount which must be paid, post-petition, to an undersecured creditor to result in liquidation of that claim. Therefore, we conclude that the Debtor must be correct when she argues that the portion of Cenlar's claim found to be unsecured in *Cole I* must be deducted from Cenlar's principal balance post-bankruptcy. If not, the § 506 determination would have been a meaningless exercise.

■ The only issue remaining to be considered is Cenlar's suggestion that, while the foregoing reasoning may have been persuasive prior to the decision in *Dewsnup*, the subsequent result in *Dewsnup* alters this result. It is true that *Dewsnup* should be applied retroactively to cases which were pending before it was decided. *See In re Wicks*, 5 F.3d 1372, 1373 (10th Cir.1993); and *In re Jablonski* 139 B.R. 150, 152–54 (Bankr. W.D.Pa.1992). However, it is quite another matter to argue that the subsequent *Dewsnup* result should be applied to wipe out the prior unappealed final decision in *Cole I*. Whenever an attempt has been made to thus apply *Dewsnup* or *Nobelman* "super-retroactively," it has been rejected because the prior decision, though based on legal principles subsequently discredited by *Dewsnup* or *Nobelman*, is *res judicata* between the parties. *See Dupree, supra*, 183 B.R. at 275–85; *In re Klus*, 173 B.R. 51, 54–57 (Bankr.D.Conn. 1994); *In re Moretti*, 172 B.R. 984, 986–88 (Bankr.W.D.Okla.1994); and *In re Adebanjo*, 165 B.R. 98, 101–03 (Bankr.D.Conn.1994).

■ We therefore reject Cenlar's argument, the substance of which is that it can ignore the § 506 determination in *Cole I*. We hold that Cenlar must therefore deduct the $11,352.74 portion of its undersecured

claim determined to be unsecured in *Cole I* from the Debtor's mortgage balance.

## 2. THE PROVISIONS OF THE DEBTOR'S PLANS REGARDING POST-PETITION PAYMENTS ARE TOO VAGUE TO CUT OFF CENLAR'S REMAINING CLAIMS FOR AN ACCRUED ESCROW BALANCE.

■ As noted at page 379 *supra*, the Debtor, in her opening brief, cites three cases in support of her contention that Cenlar is barred from seeking an "escrow deficit" because it failed to periodically adjust her mortgage payment to account for the increments in costs for which it was escrowing payments during the course of the case. These cases do not support the Debtor's position.

The only case among these citations which is factually analogous to the instant case is *Conway, supra.* In that case the debtor's plan designated a specific amount ($349 monthly) to be paid to the mortgagee for post-petition payments. 126 B.R. at 28. Subsequent to not only confirmation but discharge, the mortgagee sought, as additional escrow payments, the sums which it had paid towards cost increments in taxes and insurance. *Id.* at 29. The court rejected the mortgagee's contentions, finding that the specific term of the confirmed plan fixing the post-petition monthly payments at $349 was binding on the mortgagee.

The distinction between the instant factual record and that in *Conway* is that the Debtor's 2nd Plan, which was the confirmed plan at issue here, and as subsequently amended by the 1994 Order, does not recite any specific payment amount which the Debtor intends to make to Cenlar post petition. In fact, none of the Debtor's plans address the issue of post-petition payments to Cenlar at all. It is only because the Debtor, Cenlar, and the Trustee all assumed that the Debtor intended to make post-petition payments that the plans, as drafted, could be said to relate to any provisions regarding post-petition payments. An implied, but unarticulated, term of a plan cannot bind a mortgagee in the manner of the very specific post-petition payment terms set forth in the *Conway* plan.

The only apparent relevance of *Washington, supra,* 158 B.R. at 724; and *Brown, supra,* 121 B.R. at 771, is that they articulate the general principle that a confirmation order binds creditors to the terms of a confirmed plan. Other authorities in the Debtor's reply brief are apparently cited for the same general principle, *e.g., Dupree, supra,* 183 B.R. at 282; and *In re Bowen,* 174 B.R. 840, 847–48 (Bankr.S.D.Ga.1994). This general principle is undisputed. *See also, e.g., In re Szostek,* 886 F.2d 1405, 1408–13 (3d Cir.1989); and *In re Brown,* 76 B.R. 1013, 1015–16 (Bankr.E.D.Pa.1987). However, the application of that principle to the unarticulated implicit "terms" of the Debtor's various plans is not only disputed, but unsupportable.

■ The Debtor may be making an unarticulated argument based on equitable estoppel or laches running in her favor against Cenlar on this point. However, the prerequisites for invocation of equitable estoppel are very demanding. *See In re Webb,* 99 B.R. 283, 290–91 (Bankr.E.D.Pa.1989). As we stated in *In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bankr.E.D.Pa.1991), "[e]quitable estoppel 'is triggered by "conduct by one person inconsistent with the position later adopted by him which is prejudicial to the rights of another who relied upon such prior conduct to his detriment." ' " *Id.,* quoting *In re Penn–Dixie Industries, Inc.,* 32 B.R. 173, 178–79 (Bankr.S.D.N.Y.1983), quoting in turn *In re La Difference Restaurant, Inc.,* 29 B.R. 178, 182 (Bankr.S.D.N.Y.1983), *aff'd,* 63 B.R. 819 (S.D.N.Y.1986). We noted there that the party against whom estoppel is asserted must intentionally mislead the other party *and* the party claiming estoppel must lack the means to ascertain the true facts to permit invocation of equitable estoppel. *Richard Buick, supra,* 126 B.R. at 846–47. During the Debtor's testimony she testified that she was aware that annual taxes were due on the Home and that Cenlar paid these taxes on her behalf. She admitted that she had received annual statements from Cenlar showing interest, insurance, and taxes paid on her behalf. Cenlar acted consistently with its responsibilities as defined by the mortgage, *i.e.,* that it would pay the taxes due on the Home directly to the taxing au-

thorities. We may assess some fault to Cenlar for never contemporaneously demanding the annual escrow shortfall or performing annual escrow analyses, but these actions hardly rise to the level of intentionally misleading conduct. Furthermore, the Debtor knew, or should have known, that she was liable for any tax payments made by Cenlar on her behalf. Finally, the annual statements provided by Cenlar provided the Debtor with information regarding her tax liability sufficient to preclude her invocation of equitable estoppel. Therefore, equitable estoppel cannot come to the aid of the Debtor in these circumstances.

■ Any argument of the Debtor based on the doctrine of laches must fail as well. To prevail on the ground of laches the Debtor was obliged to satisfy a two-step test establishing that Cenlar " 'inexcusably delay[ed] in light of the equities of the case and prejudice[d]' " the Debtor. *In re U.S. Metalsource Corp.*, 163 B.R. 260, 268 (Bankr. W.D.Pa.1993), quoting *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949 (3d Cir.1971). While it is clear that a case could be made for inexcusable delay on Cenlar's behalf based on the foregoing facts, it is just as clear that the Debtor had actual notice of the payments made on her behalf and knew of her liability for those payments. Therefore, we cannot say that the Debtor was prejudiced by Cenlar's delay in asserting its right to reimbursement for the tax payments made on the Debtor's behalf. We thus conclude that the Debtor may not invoke the doctrine of laches to avoid her liability for these payments.

We therefore reject the Debtor's argument that Cenlar is barred, either due to the terms of her confirmed plans, or by any other legal theories, from arguing that the Debtor is liable to it for any escrow deficits.

3. *THE DEBTOR IS ENTITLED TO HER CHAPTER 13 DISCHARGE AND A DECLARATION THAT THE DEBTOR OWES CENLAR A BALANCE OF ONLY $20,035.86.*

Having resolved the two major legal issues raised by the parties, we are still faced with the task of making a clear resolution to what will hopefully be the final disputes in a case which has remained on our docket far too long.[4]

With respect to the bankruptcy case itself, we first consider whether we can bring it to its normative end of discharge, despite the failure of the Complaint in the Proceeding to pray for such relief. The pertinent statutory provision regarding a Chapter 13 discharge is 11 U.S.C. § 1328(a), which reads, in pertinent part, as follows:

§ 1328. **Discharge**

(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

(1) provided for under section 1322(b)(5) of this title; . . .

Section 1328(a)(1) precludes the discharge of Cenlar's claim, since the Debtor's plans seek to cure her default in Cenlar's secured obligation, the last payment on which is due after the final plan payment, pursuant to 11 U.S.C. § 1322(b)(5). The Trustee's report indicates that the Debtor paid him a total of $13,095.55 and that, in light of the Trustee's payment to Cenlar of $11,945.73 when it was only entitled to be paid $9,216.16 per the 2nd Plan as amended by the 1994 Order, these payments clearly represented completion of all payments due under the Debtor's confirmed 2nd Plan, as amended. None of the interested parties contest the fact that these payments have been made. Given the requirement of § 1328(a) that a discharge "shall" be granted upon the making of all plan payments due, we must direct the Trustee to promptly prepare his final report and discharge the Debtor.

Computing the post-petition balance due from the Debtor to Cenlar is not so clearly

---

**4.** This case, filed on February 14, 1990, is the only 1990 Chapter 13 case on our docket. We anticipate that all of our *1991* Chapter 13 cases will be closed in a few months.

and easily done. We can begin from the parties' agreement that the principal balance due on Cenlar's books, putting aside the issue of whether the balance can be reduced due to the § 506 determination in *Cole I*, is $29,534.37.

We decline Cenlar's request that we find the Debtor to be significantly in arrears in post-petition payments and add to this figure for that reason. Per the 1996 Stip., Cenlar agreed that the Debtor's post-petition defaults equalled an amount between $1,556.48 and $1,945.60 in January 1996. Cenlar admits receipt of $1,556.48 plus all post 1996 Stip. mortgage payments. At most, Cenlar retains a claim of $389.12 for unpaid post-petition payments due. Cenlar will not be heard to claim that these figures are inaccurate because it continued to confuse credit for plan payments with post-petition payments in its records. By January 1996, when the 1996 Stip. was approved, Cenlar was obliged to have corrected any such discrepancies, if not in its records, then in its mind, before entering into the 1996 Stip. The Debtor was entitled to rely on the figures by which Cenlar agreed to be bound in the 1996 Stip. Cenlar has, to date, never sought to modify the terms of the 1996 Stip. It cannot attempt to implicitly do so at this late stage.

Cenlar has added on claims for mortgage premium insurance ($12.38) and accrued late charges ($1,055.86) to the post-discharge principal balance claimed due in its calculations. While no clear support for these items, as claimed, appears readily ascertainable, we believe that such charges may well have some justifiable basis.

Cenlar continues to seek $3,125.44 towards its alleged escrow deficit. Having rejected the Debtor's argument that any such claims are barred as a matter of law, *see* pages 382–83 *supra*, and finding some support for such claims in the increases of real estate taxes against the Home, we are inclined to allow this amount in full as claimed.

We are uncomfortable with the fact that the Trustee's undisputed records show that Cenlar was paid $11,945.73, when it was only due to receive $9,216.16 under the terms of the 1994 Order, a difference of $2,728.57. In order to apply rough justice to bring this matter to closure, we are prepared to allow Cenlar the mortgage insurance premiums, late charges, and escrow deficit which they seek. We will add to the balance the disputed $389.12 payment, making the net total due $4,582.80. Then, we will set off the $2,728.57 unexplained windfall to Cenlar from that sum, leaving a balance of $1,854.23 to be added to the principal balance due. We also will proceed to deduct the $11,352.74 unsecured portion of Cenlar's claim allowed in *Cole I*, per our discussion at pages 380–82 *supra*. We therefore compute the Debtor's balance to Cenlar as follows:

| | |
|---|---|
| Principal Balance Due | $29,534.37 |
| Net Additional Amount Due (see above) | 1,854.23 |
| Subtotal | $31,388.60 |
| (Less) Unsecured Portion of Claim Disallowed in *Cole I* | 11,352.74 |
| | $20,035.86 |

We are not inclined to award the Debtor any refunds of commissions or any other relief from the Trustee. We note that none of the interested parties, including the Debtor are blameless in the confusion that has resulted, because none of them monitored this case with sufficient care, and the primary responsibility of monitoring her own case lay with the Debtor. We also observe that the justice effected here is rough, and we recognize that we may have overlooked some relevant facts lurking in the confusing mass of Cenlar's records or other matters of record. We would therefore welcome a timely motion to reconsider any errors in calculations, pursuant to Federal Rule of Bankruptcy Procedure 9023, as opposed to an appeal to correct any such errors which would lengthen the period that this case will remain open.

## D. CONCLUSION

With the aforesaid reservations, an order consistent with the foregoing conclusions will be entered.

## ORDER

AND NOW, this 6th day of November, 1996, after the trial of the above proceeding

on September 26, 1996, and October 3, 1996, and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgement is entered in part in favor of the Plaintiff–Debtor, BRENDA A. COLE ("the Debtor"), and against the Defendants CENLAR FEDERAL SAVINGS BANK ("Cenlar") and EDWARD SPARKMAN, TRUSTEE ("the Trustee").

2. It is DECLARED that the Debtor is entitled to a discharge of all dischargeable debts. The Trustee shall prepare, file, and serve all documents necessary to affect the Debtor's discharge on or before November 15, 1996.

3. It is further DECLARED that the Debtor's post-petition balance to Cenlar, as of October 3, 1996, is $20,035.86.

4. All other relief sought by the Debtor in her Complaint is DENIED.